## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

|  |  |
|---|---|
| In re:<br><br>MICHAEL J. ROBERTS, SR.<br>SSN/EIN: xxx-xx-3582<br><br>Debtor. | Case No. 22-10521-JGR<br>Chapter 11, Subchapter V |

## ORDER CONVERTING CHAPTER 11 CASE TO CHAPTER 7

This matter is before the Court on the Motion to Convert Chapter 11 Case to Chapter 7 (Doc. 149; "Motion") filed by PdC, LLC; Timothy Flaherty; Timothy Kneen; and Riviera Country Club, S. de R.L. de C.V. (collectively, "PdC Creditors") on May 6, 2022, and Debtor's Objection and Response in Opposition thereto (Doc. 175; "Response") filed by Debtor Michael Roberts, Sr. on May 20, 2022. On June 29-30, 2022, the Court held an evidentiary hearing on this matter. Following the hearing, the parties submitted proposed findings of fact and conclusions of law. Having considered the parties' submissions, the evidence presented to the Court, and being otherwise fully advised in the premises, the Court makes the following findings and conclusions.

## INTRODUCTION

Roberts is an individual investor who has been engaged in litigation with the PdC Creditors for at least four years.  He filed this case while in jail for civil contempt of the Denver District Court. As a result of other orders entered by the Denver District Court, the PdC Creditors hold a writ of attachment on substantially all of Roberts' assets and an injunction prohibiting Roberts from conveying, transferring, encumbering, selling, disposing, or otherwise affecting the location or ownership of any of the assets.  Roberts filed his Chapter 11 case on the eve of a damages hearing in the Denver District Court, shortly after he filed a motion to continue the damages hearing for the third time but before the Denver District Court ruled on the motion.

## BACKGROUND

### I. Assets and Liabilities

Roberts testified and filed Schedules A and B asserting he owns, directly or indirectly through wholly owned entities, assets of approximately $53 million.  Such assets include a home in Boulder valued at $5.278 million; artwork; a vintage car collection; cabins in Ferncliffe, Colorado; undeveloped lots in Hawaii, Costa Rica, and Mackinac Island; a coffee business in Hawaii; and an office building in Boulder.  Of particular note here, Roberts has a 33% ownership interest in PdC, LLC and a 100% ownership interest

in Ciro Properties, LLC. As of this writing, entities controlled by Roberts have recently sold, or are in the process of selling, substantial items of Roberts' claimed assets, including Hawaiian property and the office building in Boulder. Additionally, certain creditors recently received a comfort order to foreclose on other Hawaiian property titled in the name of an entity wholly owned by Roberts without the hindrance of the automatic stay. However, the proceeds from these sales are subject to a writ of attachment in favor of the PdC Creditors. Roberts' only consensual secured debt is represented by two mortgages totaling approximately $700,000 encumbering his home in Boulder, which have remained current. His unsecured debts consist of two categories: credit card debt of $88,000 and attorney's fees and expenses for his various counsel totaling $1.58 million. His debts arising out of the litigation with the PdC Creditors have been set by the state court at $21 million, with further hearings to be conducted to increase the damages. Roberts is an investor who is not employed and does not receive W-2 income.

He filed his first proposed Chapter 11 plan of reorganization on May 19, 2022. Due to the pending Motion, the Court has not set dates for voting on, objecting to, or holding a hearing on plan confirmation.

## II. State Court Litigation

Roberts, creditor Timothy Flaherty, and creditor Timothy Kneen were the three members and managers of a Colorado entity, PdC, LLC, which was formed to purchase and develop beachfront land in Mexico near Playa del Carmen, Quintana Roo. Because Mexican law does not allow foreign nationals to directly own land on Mexico's coast, the venture was to be carried out via a Mexican subsidiary of PdC, Riviera Country Club, S. de R.L. de C.V. ("RCC"), beginning in 2007. Like PdC, RCC's three managers were Flaherty, Kneen, and Roberts. PdC acquired its first parcel of Mexican land, known as "Sereno I" for $8 million in 2006. Another entity, TMTBC, LLC—also owned by Flaherty, Kneen, and Roberts—obtained a neighboring property, referred to as the "Beach House," in 2008. Finally, in 2012, RCC acquired two parcels next to Sereno I, known as "Sereno II" and "Sereno III," (sometimes referred to as the "Mustapha Properties") for $11.5 million. In this transaction, $6 million was paid outright, with the remaining $5.5 million subject to a lien held by a Spanish entity, Hoteles Turisticos Unidos, S.A. ("Hotusa"). At the time of RCC's purchase of Sereno II and Sereno III, the properties were subject to foreclosure litigation initiated by Hotusa. After purchasing Sereno II and Sereno III, RCC signed a settlement agreement with Hotusa by which Hotusa agreed to release its lien in exchange for $6.5 million.

RCC made an initial payment of $1 million to Hotusa, funded by two $500,000 loans, one each from Flaherty and Kneen. While RCC tried to come up with the remaining funds, it made several extension payments delaying payment of the final $5.5 million through December 31, 2016. During this time, Roberts contemplated in a note to himself whether he "could skirt RCC and sign away their rights and position by using [his] power of attorney?" Ex. 44 ¶¶ 16, 31. After sources of external funding did not materialize, Flaherty agreed to loan the $5.5 million (using funds he readily had available) to PdC to satisfy RCC's final payment to Hotusa. Roberts objected, instead offering to source

2

RCC's $5.5 million himself, subject to certain conditions that included the right to pursue development of the property for six months rather than immediately offering it for sale (as planned by Flaherty and Kneen). After Flaherty and Kneen agreed to Roberts' plan, instead of making the $5.5 million payment on behalf of PdC or RCC, he fraudulently granted a power of attorney on RCC's behalf—without Flaherty or Kneen's knowledge or permission—to his personal attorney in Mexico, who then ratified a settlement agreement in the Mexican courts effectuating Roberts' personal acquisition of the Sereno II and Sereno III lien from Hotusa. Roberts then attempted to foreclose on Sereno II and Sereno III and hired armed guards to take physical possession of all the Mexican properties: the Beach House and Serenos I, II, and III. These guards denied access to Flaherty, Kneen, and PdC's agents. By attempting to foreclose on Sereno II and Sereno III for himself at the expense of RCC and PdC, Roberts' actions violated his "fiduciary duties to PdC and its stakeholders by violating his duty of loyalty and engaging in intentional misconduct." Ex. 44 ¶ 66.

As a result of the aforementioned events, in 2018 the PdC Creditors filed cross claims and a third-party complaint against Roberts and two of his entities in an existing Denver District Court lawsuit that had been filed against the PdC Creditors by creditor Richard Lang. This litigation occurred concurrently with other litigation in Mexico, wherein Roberts claims to have prevailed and cemented his sole legal rights to the Hotusa lien. In the Denver District Court, the PdC Creditors alleged that Roberts engaged in a fraudulent scheme to misappropriate the rights of his partners in the Mexican land venture. Roberts has claimed that the Denver District Court lacks subject matter jurisdiction over these disputes because RCC's Articles of Incorporation contain a clause that any disputes about the Mexican projects are subject to the exclusive jurisdiction of the Mexican courts. The Denver District Court has rejected this argument on multiple occasions. *See, e.g.*, Ex. 44 ¶ 58.

On January 24, 2019, the PdC Creditors obtained a preliminary injunction against Roberts after a full day evidentiary hearing in front of Denver District Judge Plotz, enjoining Roberts from taking any further action to misappropriate PdC property in Mexico. Ex. 4. Roberts defied the preliminary injunction by, among other actions, transferring his interest in the Hotusa lien (on Sereno II and Sereno III) to a Mexican entity he controlled, Logistics Desarrollos Publicitarios e Inmobiliarios ("Logistics") in July 2019. Roberts then transferred his interest in Logistics to two Mexican nationals for no consideration, effectively transferring "legal control over the properties to persons beyond the jurisdiction of [the Denver District Court]." Ex. 44 ¶ 53. After Roberts ignored the preliminary injunction, the PdC Creditors filed a motion for contempt.

On January 6, 2020, after another full day evidentiary hearing, Denver District Judge Johnson entered a contempt order requiring Roberts to be jailed and pay a fine of $1,000 per day until his contempt was purged. Ex. 7. Following the entry of the contempt order, on January 24, 2020, Judge Johnson conducted a trial on the merits and on June 19, 2020, entered a judgment against Roberts finding he had breached his fiduciary duty to the PdC Creditors in executing the secret and fraudulent scheme to take Hotusa's position for himself. Ex. 8.

Then, on August 28, 2020, based upon Roberts' failure to comply with the preliminary injunction or contempt order, Judge Johnson granted the PdC Creditors an ex parte attachment to freeze Roberts' assets and ordered Roberts to be taken into custody for contempt. Ex. 14.

Next, on October 20, 2020, Judge Johnson entered a discovery sanctions order striking all of Roberts' defenses, dismissing his answer to cross claims and his counter cross claims, precluding him from introducing evidence he had failed to produce, and entering default in favor of the PdC Creditors and against Roberts on all claims. Ex. 15. The Denver District Court set a damages hearing for December 21, 2020, which was continued not once, but twice.

After another full day evidentiary hearing on August 6, 2021, Denver District Judge Moses remanded Roberts to be incarcerated until he complied with the outstanding orders of the Court and remedied his misappropriation of the Mexican property. Ex. 23. Roberts was released two weeks after his incarceration, but Judge Moses had Roberts jailed again when he failed to purge his contempt. On October 6, 2021, in upholding the previously issued writ of attachment, Judge Moses found that Roberts concealed himself and his assets, thereby avoiding service of process, defying court orders, and acting with an intent to hinder or delay his creditors. Ex. 24. Judge Moses set the damages hearing for February 22, 2022, the third time this hearing was scheduled, but Roberts filed bankruptcy on February 18, 2022, resulting in yet another postponement of the damages hearing. The bankruptcy filing also effectuated his release from jail even though he had not purged his remedial contempt and was still in violation of Denver District Court orders.

### III. Bankruptcy Litigation

#### A. Relief from Stay

The PdC Creditors have twice obtained relief from stay during the pendency of Roberts' bankruptcy case.

First, the PdC Creditors obtained relief from stay on March 25, 2022, over Roberts' objection, to conduct the damages trial in the Denver District Court case.  On June 23, 2022, Judge Moses entered a detailed 32-page damages award in favor of the PdC Creditors and against Roberts for a total of $10,456,162 in actual damages, $5,500,000 in exemplary damages, and $5,168,824 in prejudgment interest on actual damages. Ex. 44. She also awarded attorney's fees and expenses, in an amount to be determined. Judge Moses' damages order—like many earlier orders of the Denver District Court— detailed numerous instances of Roberts' bad conduct, including disobeying court orders, defrauding investors, and lying under oath. Judge Moses found that Roberts' actions prevented Kneen and Flaherty from selling all four properties as a bundle. When Flaherty and Kneen finally decided to sell Sereno I by itself in 2021, it was at a lower price than if they had sold it, as they had hoped, in 2017. As to Sereno II and Sereno III, Judge Moses concluded that Roberts caused a total loss to the PdC creditors.

At the hearing on the Motion in the Bankruptcy Court, Roberts' counsel argued that because of Roberts' ownership interests and investments in PdC, Roberts is entitled to more than half of the Denver District Court's $21 million judgment against him and in favor of the PdC Creditors. Roberts also argues that he is entitled to a large sum (in excess of 68% of $40 million) on behalf of his entity, Ciro Properties, which has filed an adversary proceeding in this Court (discussed below). The PdC Creditors argue that Roberts is not entitled to any of their favorable Denver District Court judgment because Judge Moses already set-off Roberts' $5.5 million paid for the Hotusa lien. The PdC Creditors also argue that they might be entitled to future profits from the Mexican properties under Colorado law on breach of fiduciary duty. The PdC Creditors argue that these set off issues should and will be decided by the Denver District Court.

Second, on May 12, 2022, the PdC Creditors obtained relief from stay to proceed in state court to enforce the previous orders of the Denver District Court related to the preliminary injunction, writ of attachment, and civil contempt order.

### B. Adversary Proceedings

Roberts has filed three adversary proceedings since the filing of the bankruptcy case:

(1) *Roberts v. Riviera Country Club S. de R.L. de C.V.*, Case No. 22-1052-JGR, which, in the view of this Court, seeks to relitigate issues already decided by the Denver District Court, namely by seeking recognition of the result of the Mexico litigation.  The PdC Creditors have moved to dismiss this action on the bases of lack of subject matter jurisdiction; res judicata and collateral estoppel; and the Rooker-Feldman doctrine. The Court entered a stay of this Adversary Proceeding on June 1, 2022, pending the outcome of the Motion to Convert.

(2) *Ciro Properties, LLC v. PdC, LLC*, Case No. 22-1137-JGR, which is an attempted removal by Roberts of a state district court civil action to which he is not a party. The state court action was filed in Arapahoe County and subsequently ordered consolidated with the pending Denver District Court litigation. The PdC Creditors have moved the Court to remand this Adversary Proceeding back to the Denver District Court. The Court entered a stay of this Adversary Proceeding on June 1, 2022, pending the outcome of the Motion to Convert.

(3) *Roberts v. Almazan*, Case No. 22-1133-JGR, which is an avoidance action against two Mexican Nationals to recover Roberts' interest in Logistics that he consensually transferred for no consideration as part of his fraudulent scheme. As of the date of this writing, this Adversary Proceeding has been pending for over five months, yet Roberts has not served the defendants with process. The Court has not stayed this Adversary Proceeding pending the outcome of the Motion to Convert.

### C. Motion to Convert or Dismiss

Movants, the PdC Creditors, claim that Roberts filed the Chapter 11 case in bad faith and it should be converted to a liquidation case under Chapter 7 to be administered by a Chapter 7 trustee.  They claim he filed the bankruptcy case under Subchapter V of the Bankruptcy Code on the eve of the damages hearing to delay the hearing, get out of jail, and avoid having the judgments of the PdC creditors liquidated. The PdC Creditors argue this bad faith results in his ineligibility to be a debtor under Subchapter V. They also claim the filing of the three adversary proceedings was in bad faith because they seek to relitigate issues either previously decided or over which the bankruptcy court lacks jurisdiction. They also claim his bad faith is evidenced by filing a plan of reorganization which contains terms contrary to the judgments of the Denver District Court, that he intends to initiate claims objections against the PdC Creditors even though the Denver District Court has ruled on those issues, and that he has significant assets that should be liquidated to pay creditors rather than engaging in prolonged litigation.  At bottom, they claim this is, in essence, a two-party dispute which is more appropriately resolved by the Denver District Court and that Roberts is seeking a second "bite at the apple" by filing the bankruptcy case and adversary proceedings. Finally, they assert Roberts' pre-petition litigation misconduct and disregard of lawful orders of the Denver District Court prohibits him from being a Chapter 11 debtor-in-possession and in control of his assets.

Roberts argues that it is proper, and common, to file a bankruptcy petition when faced with an impending judgment. He claims that the Court should ignore the previous protracted litigation in state court—including four evidentiary hearings and his unsuccessful appeals therefrom—and focus on his alleged good faith post-petition conduct as a debtor-in-possession in control of his assets. Roberts intends to continue litigating with the PdC Creditors and use the damages he recovers from the PdC Creditors, and sale and reinvestment of the proceeds of his non-exempt assets, to fund his 100% repayment Chapter 11 plan. While Roberts argues that it is premature to analyze the legitimacy of his proposed plan, he also argues that his plan has a reasonable likelihood of being confirmed, and that he satisfies 11 U.S.C. § 1112(b)'s test for preventing conversion or dismissal. As a last-ditch argument, Roberts argues that if cause for conversion or dismissal exists, his case must be dismissed because his assets include investments in cannabis companies that would become property of the estate in a Chapter 7 case.

Roberts was the only witness at the hearing. He was regularly evasive and non-responsive on cross-examination. The Court agrees with the assessment of Roberts' lack of credibility made previously by three Denver District Court judges.

## LEGAL STANDARDS

This Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), as it is a proceeding to convert the Roberts Bankruptcy Case to Chapter 7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Section 1112(b)(1) of the Bankruptcy Code provides:

Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7, or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

Dismissal or conversion under this section is a two-step process.  The Court must determine if cause exists for dismissal or conversion.  If so, the Court then must determine whether dismissal or conversion of the case is in the best interest of creditors and the estate.  *In re Peak Serum, Inc.*, 623 B.R. 609, 619 (Bankr. D. Colo. 2020) (citing *In re OptInRealBig.com, LLC*, 345 B.R. 277, 282 (Bankr. D. Colo. 2006)).

Section 1112(b)(4) sets forth a non-exclusive list of 16 factors that may constitute cause under 11 U.S.C. § 1112(b)(1).  "While bad faith is not an enumerated factor under § 1112(b), '[i]t is well established under the Bankruptcy Code, as it was under the Bankruptcy Act, that a Chapter 11 Petition must be filed in good faith . . . .'" *In re Springs Hosp., Inc.*, 2006 Bankr. LEXIS 1804, at *8-9 (Bankr. D. Colo. Aug. 22, 2006) (citing *Pacific Rim Invs., LLP v. Oriam, LLC* (*In re Pacific Rim Invs., LLP*), 243 B.R. 768, 771 (D. Colo. 2000)).

"Chapter 11 cases vary widely and do not lend themselves to a cookie cutter approach to analyzing the bad faith of a bankruptcy filing. As a consequence, bad faith, in the context of a chapter 11 filing as in most other bankruptcy contexts, is always determined on a case by case basis."  *Id.* at 9.  The movant bears the burden of establishing cause by a preponderance of the evidence.  Once cause is demonstrated, the burden shifts to the opposing party to prove "unusual circumstances" establishing that converting or dismissing the case is not in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(2); *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012).

"When presented with a request for dismissal or conversion under Section 1112(b), case law and congressional intent make it clear that a bankruptcy court has broad discretion to either grant or deny such relief. The Tenth Circuit has stated in unequivocal terms that a bankruptcy court is to be afforded broad discretion under Section 1112(b)."  *In re Western Pac. Airlines*, 218 B.R. 590, 593-94 (Bankr. D. Colo. 1998) (citing *Small Business Admin. v. Preferred Door Co., Inc.,* (*In re Preferred Door Co., Inc.*) 990 F.2d 547, 549 (10th Cir. 1993)).

**ANALYSIS**

**I. Bad Faith Factors**

In *Udall v. FDIC (In re Nursery Land Dev.)*, 91 F.3d 1414 (10th Cir. 1996), the Tenth Circuit affirmed the bankruptcy court's imposition of sanctions for filing a Chapter 11 case in bad faith.  The Tenth Circuit affirmed the bankruptcy court's finding that the

debtor lacked a realistic possibility of reorganization.  Further, the bankruptcy court's conclusion that the specific purpose of the filing was to frustrate legitimate efforts to enforce creditor rights to foreclose was amply supported by numerous indicia that constitute classic badges of bad faith.  The Tenth Circuit enumerated those factors as:

> Nursery Land (1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; and (6) lacks a reasonable possibility of reorganization, and (7) the Chapter 11 filing stopped the foreclosure.

*Id.* at 1416 (citations omitted).

These factors applied to the facts in *Nursery Land* but, despite Roberts' arguments to the contrary, they do not establish a definitive test for a finding of bad faith. In fact, when enumerating these factors, *Nursery Land* cited three other cases concerning bad faith Chapter 11 filings, including *In re Laguna Associates Ltd. Partn.*, 30 F.3d 734, 738 (6th Cir. 1994), which set forth the following factors as helpful in analyzing a Chapter 11 debtor's good faith:

> (1) the debtor has one asset;
> (2) the pre-petition conduct of the debtor has been improper;
> (3) there are only a few unsecured creditors;
> (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
> (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
> (6) the filing of the petition effectively allows the debtor to evade court orders;
> (7) the debtor has no ongoing business or employees; and
> (8) the lack of possibility of reorganization.

Except for the first factor, the remaining seven *Laguna* factors are instructive here:

> (2) Pre-petition, Roberts committed fraud and breached his fiduciary duties; lied under oath multiple times; and disobeyed direct orders of the Denver District Court.
> (3) Although the more than $21 million in judgments owed to the PdC Creditors is secured by a pre-judgment writ of attachment, the writ of attachment only issued because of Roberts' improper conduct. *See* Denver District Court Order Re: July 23, 2021 Hearing on Traverse of August 20, 2020 Writ of Attachment (October 6, 2021). But for Roberts' improper prepetition conduct, the PdC creditors would be Roberts' only significant unsecured creditor. While Roberts owes approximately $1.5 million in unsecured debt to other creditors, nearly all of these unsecured

debts are for legal fees for litigation with the PdC Creditors and living expenses while his assets were frozen by the Denver District Court.

(4) Although not posted for foreclosure, Roberts' property has been attached to satisfy his creditors—the same function as a foreclosure—and Roberts has been unsuccessful in defending against the attachment in state court.

(5) Roberts filed this Chapter 11 case on the eve of the damages hearing that had been continued three times. He had already lost on the merits and was facing multiple millions of dollars in judgments against him. These judgments were eventually liquidated in excess of $21 million and will grow even larger.

(6) Roberts filed for bankruptcy while in jail for civil contempt for disobeying Denver District Court orders and after filing two federal habeas corpus petitions. One was denied and another was pending when he filed his bankruptcy petition. Doc. 104 at 9 n.4. His bankruptcy petition secured his prompt release from jail without purging his contempt. Approximately three months after the case was filed, on May 12, 2022, the Court found that the automatic stay does not apply to the Denver District Court's contempt and enforcement proceedings against Roberts. The Court lacks complete knowledge of the extent to which the Denver District Court contempt and enforcement orders (of which there are several) are currently being enforced but notes that Roberts appeared in-person at the hearing on June 29-30, 2022, and the Court has not been informed that he has been remanded to custody.

(7) Roberts is an individual investor who has no ongoing business or employees.

(8) As touched on above, Roberts' Chapter 11 plan involves reinvesting his assets into income-producing ventures. He proposes to pay unsecured creditors (among which he included the PdC Creditors) approximately $2 million over five years, and then to pay the balance via a balloon payment of approximately $22 million, which will be funded by a liquidation of property. The Court questions whether Roberts' plan is feasible and proposed by means not forbidden by law (in contravention of orders of the Denver District Court), and therefore whether the plan is confirmable under 11 U.S.C. § 1191 and the applicable subsections of 11 U.S.C. § 1129.

After reviewing these factors, the Court concludes Roberts filed this Chapter 11 case in bad faith. In fact, this case presents a textbook example of a bad faith bankruptcy filing. It was filed on the eve of a state court damages hearing in order to stay the hearing and obtain release from jail without purging the Denver District Court's civil contempt orders. It is a two-party case. The credit card debt was substantially incurred due to the asset freeze. The attorney's fees were incurred to litigate with the PdC Creditors in a Mexican court, the Denver District Court, the Arapahoe County District Court, the Colorado Court of Appeals, and the Colorado Supreme Court. It was filed to re-litigate

and invalidate the judgments of the Denver District Court, manipulate the judicial system, and seek to regain control of Roberts' property.

The plan relies on relitigating the losses in state court and liquidating non-exempt assets not to pay creditors but to re-invest in other income producing assets and pay the creditors through the income stream from such assets with a $22 million balloon payment in five years.

## II. Cannabis

No better example of Roberts' lack of good faith can be found than with respect to his opposition to conversion.

Roberts claims interests in two cannabis-related companies. The first, Serovita Holding Corp., may not relate to cannabis at all. Roberts testified at the hearing that Serovita previously consulted in the marijuana industry in the past, but that he does not know if it does anymore. Not only is the nature of Serovita's business unknown, but so too is the amount of Roberts' interest in the company. The second cannabis-related company is Denver Packaging Company, LLC ("D-Pack"). According to Roberts' hearing testimony, D-Pack is "a marijuana business." However, the Court lacks any information about D-Pack's daily business operations. While the Court is aware that Roberts' 99%-owned entity, Sandstone Ventures, LLC, owns approximately 15-20% of D-Pack, the value of Roberts' cannabis assets is unknown. In the liquidation analysis attached to Roberts' first proposed plan, he values marijuana-related assets as worth $2.2 million, but only $265,000 if they are liquidated. In his proposed findings of fact submitted to the Court, Roberts appears to misquote his own liquidation analysis, representing instead that he has $4 million worth of investments in companies whose operations involve marijuana.

Roberts voluntarily sought relief under Chapter 11 of the Bankruptcy Code, and has remained in Chapter 11 for seven-and-a-half months, with the knowledge of his interests in these companies. Nevertheless, Roberts argues that a Chapter 7 trustee cannot administer his cannabis-related assets (presumably because it would be illegal to do so) and therefore his case may not be converted to Chapter 7.

In making his argument, Roberts relies on *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 371-76 (2007) and *In re Arenas*, 535 B.R. 845, 845 (10th Cir. BAP (Colo.) 2015). However, neither of those cases compel dismissal here.

In analyzing the interplay between 11 U.S.C. §§ 706 and 1307(c) when a debtor seeks conversion of a Chapter 7 case to Chapter 13, the *Marrama* Court wrote:

> In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as

10

a debtor under Chapter 13. That individual, in other words, is not a member of the class of " 'honest but unfortunate debtor[s]' " that the bankruptcy laws were enacted to protect. . . . The text of § 706(d) therefore provides adequate authority for the denial of [the debtor's] motion to convert.

549 U.S. at 373-74. *Marrama* involved a bad faith debtor seeking to convert his Chapter 7 case to Chapter 13 in order to wrest control of the bankruptcy estate away from the trustee and back to himself. In its opinion affirming the lower courts' denial of conversion, the Supreme Court did not go so far as to require that the debtor's Chapter 7 case be dismissed. To the contrary, the Supreme Court implicitly endorsed the principal that while bad faith may preclude a debtor from proceeding under Chapter 13, it does not necessarily require dismissal of his Chapter 7 case. Such reasoning also bears on a finding of bad faith Roberts' case: he may either proceed in Chapter 7 or have his Chapter 11 case dismissed.

Both the Bankruptcy Code and the other case law interpreting it reinforce the proposition that a bad faith Chapter 11 case may either be dismissed or converted to Chapter 7. The list of constraints on conversion in 11 U.S.C. § 1112(a) do not include bad faith. Additionally, numerous courts have found that "bad faith" is an unenumerated factor constituting cause under 11 U.S.C. § 1112(b), which permits—but does not require—dismissal. *See In re Springs Hosp., Inc.*, 2006 Bankr. LEXIS 1804, at *8-9 (Bankr. D. Colo. Aug. 22, 2006). After all, the definition of "cause" under 11 U.S.C. § 1112(b)(4) does not dictate what a court may do upon a finding of "cause." That charge is found in 11 U.S.C. § 1112(b)(1), which requires a court to "convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate . . . ." Accordingly, only one inquiry bears on whether this case should be dismissed or converted. It is not Roberts "bad faith," but only what is in the best interest of creditors and the estate.

Roberts' other case, *In re Arenas*, specifically analyzes a cannabis issue. There, the Tenth Circuit Bankruptcy Appellate Panel ("BAP") affirmed the denial of conversion, and the subsequent dismissal at the request of the United States Trustee, of a jointly filed Chapter 7 case in which the debtors grew marijuana in one unit of their building and leased the other unit to a marijuana dispensary. The BAP's opinion relies heavily on the bankruptcy court's finding that the debtors violated the federal Controlled Substances Act ("CSA"). Here, although Roberts' conduct may have violated the CSA, the Court lacks adequate information to analyze that question; there are simply not enough facts in the record. However, the Court notes that even based on the record, Roberts' connections to cannabis appear far more attenuated than those of the *Arenas* debtors. He only owns interests in businesses that have amorphous investments in the cannabis industry. Importantly, the United States Trustee did not object to conversion in this case, but stated that it might later seek dismissal if the case is converted to Chapter 7, depending on the cannabis entanglements. If Roberts' connections to cannabis require dismissal, that issue will have to wait until a later date and more developed record.

As a final point on the cannabis issue, the Court is guided by the Ninth Circuit Bankruptcy Appellate Panel who, in reviewing cannabis cases, wrote that "the mere presence of marijuana near a bankruptcy case does not automatically prohibit a debtor from bankruptcy relief . . . Instead, a bankruptcy court must be explicit in articulating its legal and factual bases for dismissal in cases involving marijuana" *In re Burton*, 610 B.R. 633, 637-38 (Bankr. App. 9th Cir. 2020). Because the Court cannot explicitly articulate its factual bases for a marijuana-based dismissal beyond an unacceptable level of speculation, the Court will not dismiss Roberts' case due to cannabis at this time but rather grant the PdC Creditors' Motion to Convert.

## CONCLUSION

Roberts has engaged in a level of pre-petition litigation misconduct not previously seen by this Court.  He never presented an excuse for noncompliance with court orders— or any efforts to show compliance—and exhibited utter disregard for valid orders of the Denver District Court.  His bankruptcy filing attempts to alter not only the outcome of his financial affairs, but a bankruptcy outcome under which he never intends to purge his contempt of the Denver District Court.  He seeks to wave a "magic wand" to sanitize his transgressions and remain in control of his assets as a fiduciary to his creditors for five more years. This case demands the swift appointment of a neutral third party in the form of a Chapter 7 trustee.

Therefore, the Court hereby

ORDERS:

1. PdC Creditors' Motion to Convert Chapter 11 Case to Chapter 7 is GRANTED. This Chapter 11 case is converted to a case under Chapter 7.

2. The United States Trustee is authorized appoint a Chapter 7 Trustee to administer the estate. Within 60 days after appointment, the Chapter 7 Trustee shall file status reports in each of the three adversary proceedings referenced on page 5 of this Order.

3. The Debtor in possession shall:

   a. forthwith turn over to the Chapter 7 Trustee all records and property of the estate in its possession or control as required by Fed. R. Bankr. P. 1019(4);

   b. within 14 days of the date of entry of this order, file a schedule of all unpaid debts incurred after the commencement of the Chapter 11 case, including the name and address of each creditor, as required by Fed. R. Bankr. P. 1019(5);

   c. within 30 days following the entry of the order of conversion, file and transmit to the United States Trustee a final report and account.

d.  within 15 days of the date of entry of this order, file the statements and schedules required by Fed. R. Bankr. P. 1019(1)(A) and 1007(b), if such documents have not already been filed.

e.  within 30 days of the date of entry of this order, or before the first date set for the meeting of creditors, whichever is earlier, if required, file a statement of intention with respect to retention or surrender of property securing consumer debts, as required by 11 U.S.C. § 521(a)(2)(A) and Fed. R. Bankr. P. 1019(1)(B); and

f.  if this Order enters after confirmation a plan of reorganization, file, within 30 days of the date of entry of this order, the schedules required by Fed. R. Bankr. P. 1019(5)(C)(i)-(iii). The Court

FURTHER ORDERS that the Debtor, and his agents, servants, employees, and attorneys are herein enjoined from taking any action with respect to any assets or records of the Debtor, save and except to preserve the same and to forthwith turn over the same to the Chapter 7 trustee appointed herein pursuant to Fed. R. Bankr. P. 1019(4).

Dated this 23rd day of September, 2022.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge

13