# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **In re:** | |
| **MICHAEL JOSEPH ROBERTS, SR.,** **(Debtor)** | **Bankruptcy Case No. 22-10521-JGR** **Chapter 7** |
| **MICHAEL JOSEPH ROBERTS, SR.** | |
| **Appellant** | **U.S. District Court** |
| **v.** | **Case No. 22-CV-2699 REB** |
| **PDC, LLC;** **TIMOTHY FLAHERTY;** **TIMOTHY KNEEN;** **RIVIERA COUNTRY CLUB, S. DE. R.L. C.V.S,** **Appellees.** | |

## OPENING BRIEF

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with U.S.C.S. 8015(a)(7)(B). It contains 10,646 words.

By:   _/s/ Robert C. Podoll, Esq._

# TABLE OF CONTENTS

I.  Statement of Jurisdiction ................................................................1

II.  Statement of Issues on Appeal.......................................................1

III.  Statement of the Case ...................................................................3

    A.  The Mexican Development ....................................................3

    B.  The Parties' Dispute .............................................................6

    C.  Ensuing Litigation ...............................................................7

    D.  The Proceedings in the Bankruptcy Court .........................17

IV.  Summary of Argument .................................................................19

V.  Argument .....................................................................................21

    A.  The Bankruptcy Court Erred in Finding Bad Faith in the Filing of the Petition................................................................21

        1.  Standard of Review.................................................21

        2.  Distinguishing Good Faith from Bad Faith Filings .................22

        3.  The Bankruptcy Court Wrongfully Equated the Orders of the Denver Court with Bad Faith in Filing Debtor's Petition .........................................25

        4.  The Bankruptcy Court Wrongfully Found Bad Faith in the Timing of the Filing of the Bankruptcy Petition.................28

        5.  In Evaluating Other Factors from In Re Laguna Associates, the Bankruptcy Court Made Findings Unsupported by the Evidence ...................................30

        6.  The Petition Was Filed for Valid Bankruptcy Purposes...........40

        7.  The Bankruptcy Court Failed to Consider Unusual Circumstances .........................................................42

VI.  Conclusion ...................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alcoa S.S. Co. v. M/V Nordic Regent*,
  654 F.2d 147 (2d Cir. 1980) ......................................................................8

*Axelson v. Columbine Laundry Co.*,
  81 Colo. 254 (Colo. 1927) .......................................................................27

*Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)........................23

*Bernhardt v. Commodity Option Co.*,
  528 P.2d 919 (Colo. 1974) .......................................................................34

*Buechner v. Rouse*,
  538 P.2d 117 (Colo. Ct. App. 1975) .......................................................39

*Colorado Vanadium Corp. v. Western Colorado Power Co.*,
  213 P. 122 (1923)............................................................................... 13, 27

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990)......................22

*Crisman v. Dorsey*,
  21 P. 920 (Colo. 1889)..............................................................................34

*Hall v. Vance*,
  887 F.2d 1041 (10th Cir. 1989) ...............................................................42

*Hooper v. Musolino*,
  234 Va. 558, 364 S.E.2d 207 (1988) .......................................................16

*Hutson v. Am. Home Mortg. Servicing*,
  No. C 09-1951 PJH, 2009 U.S. Dist. LEXIS 96764, at *29 (N.D. Cal.
  Oct. 16, 2009) ...........................................................................................17

*In re Bullseye Energy, LLC*,
  2020 Bankr. LEXIS 3289, 2020 WL 6928198 (2020) ........................ 22, 25, 37

*In re Copperas Creek, Ltd. Liab. Co.*,
  2012 Bankr. LEXIS 3463 ..........................................................................24

*In re Ford*,
   2013 Bankr. LEXIS 2317 .......................................................................24

*In re Jet Sales West LLC*,
   2021 Bankr. LEXIS 3448 ............................................................ 25, 36

*In re Laguna Associates Ltd. Ptshp.*,
   30 F. 3d 734 (6th Cir. 1994) ....................................................... passim

*In re Marshall*,
   298 B.R. 670 (Bankr C. D. CA 2003) ...............................................24

*In re McTiernan*,
   519 B.R. 860 (D. Wyo, 2014)...............................................................43

*In re Melendez Concrete, Inc.*,
   No. 11-09-12334 JA, 2009 Bankr. LEXIS 2925 (Bankr. D.N.M. Sep.
   15, 2009) ...............................................................................................43

*In re Nursery Land Dev., Inc.*,
   91 F.3d 1414 (10th Cir. 1996) .............................................................18

*Jayne v. Peck*,
   395 P.2d 603 (Colo. 1964)....................................................................13

*Mizokami Bros. of Arizona, Inc. v. Baychem Corp.*,
   556 F.2d 975 (9th Cir.1977) .................................................................9

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re
   Integrated Telecom Express, Inc.)*,
   384 F.3d 108 (10th Cir. 2004)................................................. 21, 25, 41

*Nouri v. Mortg. Lender Servs.*,
   No. B236415, 2012 Cal. App. Unpub. LEXIS 7915, at *18 (Oct. 30,
   2012) .....................................................................................................16

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL
   Carbon Corp.)*,
   200 F.3d 154 (3d Cir. 1999) .................................................................21

*Rathke v. McFarland*,
   648 P.2d 648 (Colo.1982)....................................................................29

*St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*,
  262 Md. 192, 278 A.2d 12 (1971) .........................................................................16

*Sullivan v. Harnisch*,
  52 B.R. 604 (9th Cir. Bankr App. Panel 2014) ...................................... 22, 23, 24

*Udall v. FDIC (In re Nursery Land Dev., Inc.)*,
  91 F.3d 1414 (10th Cir. 1996) .............................................................................22

*Unicure, Inc. v. Thurman*,
  599 P.2d 925 (Colo.App.1979) .............................................................................12

*Wong v. Tenneco*,
  39 Cal. 3d 126 (1985) ............................................................................................8

## OTHER AUTHORITIES

11 U.S.C. § 1112(b) ....................................................................... 1, 19, 40

28 U.S.C. § 151 ...................................................................................................1

28 U.S.C. § 158(a) ..............................................................................................1

## RULES

C.R.C.P. 102(a) .........................................................................................35

C.R.C.P. 102(b) .........................................................................................28

C.R.C.P. 102(c) .........................................................................................28

C.R.C.P. 102(e) .........................................................................................35

## I.     STATEMENT OF JURISDICTION

a.  Creditors filed their Motion to Convert Chapter 11 Case to Chapter 7 on May 6, 2022. Jurisdiction was proper in the Bankruptcy Court pursuant to 11 U.S.C. § 1112(b) and 28 U.S.C. § 151.

b.  The Debtor filed his Notice of Appeal of the decision of the Bankruptcy Court on October 7, 2022. Jurisdiction in the District Court is proper under 28 U.S.C. § 158(a).

c.  The Debtor filed his Statement of Issues and Designation of Record on Appeal on October 17, 2022.

d.  This appeal is from the final judgment of the Bankruptcy Court entered on September 23, 2022.

## II.     STATEMENT OF ISSUES ON APPEAL

1.     Whether the Bankruptcy Court committed reversible error in granting the Motion to Convert Case from Chapter 11 to Chapter 7 Pursuant to 11 U.S.C. § 1112(b)?

2.     Whether the Bankruptcy Court committed reversible error in finding bad faith in the filing of the Chapter 11 Petition based primarily upon the Orders of the Colorado District Court which:

a.  Found the Debtor in contempt based upon the false allegation that

Debtor was continuing foreclosure proceedings in Mexico; and

   b. Struck Debtor's claims and defenses based upon the false allegation that Debtor refused to comply with discovery obligations; and

   c. Froze Debtor's assets based upon the false allegation that Debtor was moving his family and assets to Poland; and

   d. Found the Debtor liable for breach of fiduciary duty at a trial convened only to determine corporate governance at which the Debtor was precluded from attending; and

   e. Incarcerated the Debtor for refusing to surrender a $5.5 million lien to which the creditors had no lawful claim, having elected to sue for damages?

3. Whether the Bankruptcy Court committed reversible error in finding bad faith of the Debtor based in part upon the timing of the filing of his Petition even though the Debtor was jailed, had contracted COVID 19, and was unable to attend the upcoming hearing in Court?

4. Whether the Bankruptcy Court committed reversible error in finding that the Chapter 11 Petition was filed in bad faith even though the filing sought valid bankruptcy purposes including the preservation of going concerns and leveling the playing field among all of the creditors?

5.      Whether the Bankruptcy Court committed reversible error in refusing to consider the unusual circumstances in this case in determining whether the Debtor could propose a workable Chapter 11 Plan?

## III.   STATEMENT OF THE CASE

**A.      The Mexican Development**

The dispute in this case arose from a failed development project in Mexico. Creditors Timothy Flaherty and Timothy Kneen, along with Carl Vertuca ("Promoters") created a venture to develop beach front villas in Mexico in 2007. ROA Vol. I, part 3 p. 414, ¶ 12. Debtor was the largest investor in the project. The parties formed PdC, LLC ("PdC") as the investment vehicle. ROA Vol. I, part 3, p. 414, ¶ 12.

PdC is a Colorado limited liability company. Mexico's Constitution prohibits foreign companies from owning certain beachfront property in Mexico. PdC formed Riviera Country Club S. De R.L. de C.V. ("RCC"), a Mexican entity, to pursue the development in Mexico. ROA Vol. I, part 3, p. 414, ¶ 14.

Promoters raised $18 million in investments for the project. (*See* Exhibit YY, attached hereto.) Promoters Kneen and Flaherty, along with Debtor invested approximately half of the funds for the development project. *Id.*

In 2007, RCC purchased beachfront property in Quintana Roo, Mexico. ROA Vol. I, part 3, p. 414, ¶ 14. Promoters created development plans and sought entitlements to construct their villas. However, in 2012, Promoters learned that the project could not be zoned to build the number of villas as planned. ROA Vol. I, part 3, p. 415, ¶ 20. Promoters raised more funds through various tranches of debt ROA Vol. I, part 3, p. 415, ¶ 24, (*see also* Exhibit VVV, attached hereto) and in 2012, RCC purchased two adjacent parcels (the "Mustapha Parcels"). ROA Vol. I, part 3 p. 416, ¶ 26.

RCC paid $5 million for the Mustapha Parcels and agreed to assume a lien in favor of Hoteles Turisticos Unidos, S.A. ("Hotusa"). When RCC bought the Mustapha Parcels, Hotusa had commenced foreclosure of its lien and RCC acquired the Property subject to the foreclosure litigation. Vol. I, part 3, p. 415, ¶ 23.

By 2013, Promoters had raised $12 million of debt in addition to the $18 million of investments. (*See* Exhibit YY, attached hereto.) To raise the debt, Promoters offered interest to the lenders at 15% per annum, compounded quarterly. (*See* Exhibit UUU, attached hereto.) According to Promoters' figures, Debtor made 37.9% of the loans. *Id.*

The development was unsuccessful. In 2014, the project ran out of money. Vol. I, part 3, p. 416, ¶ 28. In 2015, Hotusa prevailed in its foreclosure litigation and

became entitled to claim the Mustapha Parcels. In December 2015, the Promoters settled with Hotusa. Vol. I, part 3, p. 284. In the settlement, RCC agreed to pay Hotusa $1 million immediately and an additional $5.5 million by February 2016. Vol. I, part 3 p. 416, ¶ 32.

RCC did not have $5.5 million to pay to Hotusa in February 2016. The development project had failed and Promoters were attempting to sell the properties to retire the Hotusa debt and use the remaining proceeds to repay a small portion of the loans from project lenders. Vol. I, part 3, p. 416, ¶ 28. The Hotusa payment was extended to December 2016 by the payment of two successive extension fees, largely funded by Debtor.

The Promoters were unable to sell RCC's properties in 2015 and 2016. By December 2016, after two years of trying to find a buyer, the properties were unsold. Vol. I, part 3, p. 1131. The loans taken by PdC exceeded $20 million in 2014 and based upon the compounding 15% interest, reached $26 million in 2016. With the payment of $5.5 million still due to Hotusa, the project debt exceeded $31 million. *See* Exhibits YY and VVV attached hereto, documenting the project loans and their interest rates.[1] In December 2016, there was no longer a business plan for the failed

---

[1] Note, Exhibit YY portrayed only the principal balances of the RM Funding and Mezzanine loans. *See* Exhibit VVV for interest rates and interest accrual through August 2014.

development. Promoters were resigned to liquidating the project assets. Vol. I, part 3, p. 416, ¶ 28.

The best offers Kneen and Flaherty could muster in 2016 was $15 million ($13.5 million for the three parcels owned by RCC and $1.5 million for the beach house). ROA Vol. I, p. 1131. A $13.5 million sale would have resulted in $4.5 million gross proceeds for each of the three parcels. Thus, gross proceeds for the sale of the two Mustapha Parcels would have been $9 million. After costs of sale were paid and after the Hotusa lien of $5.5 million was paid, net proceeds from the sale of the Mustapha Parcels would have been only $2.3 million to be applied towards the remaining $26 million of project debt.

## B.    The Parties' Dispute

On December 13, 2016, Promoters Kneen and Carl Vertuca met with the Debtor to discuss the sale of the properties. Vol. I, part 3, p. 419, ¶ 49. Debtor told Kneen that Debtor was going to pay Hotusa and acquire the lien personally. Kneen proposed that Debtor pay Hotusa as a loan to RCC. *Id.* Debtor rejected the idea of loaning additional money to RCC.

The next day, December 14, 2016, in an email exchange Kneen acknowledged that Debtor would acquire the lien personally and proposed an arrangement where Debtor would spend up to six months putting together a deal to develop the parcels

and then contract with RCC. ROA Vol. I, part 3, p. 1140. Debtor never agreed to this arrangement either.[2] On December 16, 2016, Debtor paid $5.5 million and obtained an assignment of the Hotusa lien. ROA Vol. I, part 3, p. 420, ¶ 53.

Promoters have accused Debtor of defrauding them and secretly stealing the Hotusa lien, but Promoters knew that Debtor was constructing a plan in 2016 to develop the property. ROA Vol. I, part 3, p. 417, para 39. Promoters knew that Debtor intended to pay Hotusa. ROA Vol. I, part 3, p. 1140. Promoters charge that Debtor secretly usurped RCC's opportunity to repay Hotusa but all Debtor did on December 16, 2016 was to purchase an assignment of the Hotusa lien which still needed to be paid by the end of December. ROA Vol. I, part 3, p. 420, ¶ 54.

## C.      Ensuing Litigation

RCC did not retire the Hotusa lien (then owned by Debtor) at the end of December. Instead, RCC sued Debtor in Mexico claiming that Debtor's payment of $5.5 million was made for RCC. RCC also claimed that Debtor fraudulently gave his counsel a power of attorney to act for RCC and counsel used the power of

---

[2] However, in their pleadings in state court, Promoters alleged that Debtor agreed to make the Hotusa payment for PdC. ROA Vol. I, part 3, p. 419, ¶ 49. Even Flaherty testified in deposition (which was introduced at trial in state court) that no agreement had been reached. ROA Vol. I, part 3, p. 1145:19-22.

attorney in Court to renew RCC's request to accept the Settlement Agreement with Hotusa.[3]

The litigation had to be brought in Mexico because the Courts in Mexico have exclusive jurisdiction over the claims of Mexican Nationals such as RCC which are owned in part by foreigners. *See Wong v. Tenneco*, 39 Cal. 3d 126, 134 (1985). In fact, in creating a Mexican National company to own beach front property in Mexico, the foreign owners are required to agree to the exclusive jurisdiction of the Mexican Courts, which is preserved in the governing documents of RCC.

The Courts of Mexico found in favor of Debtor and against RCC in its claims to set aside the assignment of the Hotusa lien. Debtor's lien position was affirmed in the Mexican Federal Courts on January 11, 2019. ROA Vol. I, part 3, p. 76. After losing some of their legal battles in Mexico, the Promoters brought claims against Debtor in the Denver District Court. Based upon the provisions of Mexican law discussed above, based upon the governing documents of RCC, and based upon international comity, the Denver Court lacked jurisdiction of the claims of RCC. *See Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 156 (2d Cir. 1980), (citing

---

[3] Although the record does not reflect that Promoters knew of the verification of the Settlement Agreement in December 2016, that act was ministerial. The Settlement Agreement was authorized by Promoters and validly executed by RCC. The record discloses no conflict about its validity.

*Mizokami Bros. of Arizona, Inc. v. Baychem Corp.*, 556 F.2d 975 (9th Cir.1977) (per curiam), *cert. denied*, 434 U.S. 1035, 54 L. Ed. 2d 783, 98 S. Ct. 770 (1978)). Apparently in recognition of the jurisdictional infirmity of any claims of RCC, Promoters and PdC brought claims against Debtor, alleging that PdC owned the Mexican properties "through its subsidiary RCC." ROA Vol. I, p. 414, ¶ 14.

Promoters moved for a preliminary injunction restraining the Debtor from completing the foreclosure. The preliminary injunction hearing was held without any meaningful discovery. The Promoters alleged that Debtor had secretly conspired to acquire the lien. The Promoters falsely alleged an agreement with Debtor to purchase the lien for RCC. The Promoters falsely alleged that Flaherty would have made payment of the Hotusa lien for RCC. They filled the air with false allegations that Debtor had deceived them and had acted behind their back.

The Denver Court entered an injunction precluding Debtor from completing the foreclosure and from taking title to the Mustapha Parcels. Vol. I, part 3, p. 433. Debtor has not completed the foreclosure to this day and has not taken title to the Mustapha Parcels.

An injunction is supposed to preserve the status quo, pending a trial on the merits. However, after obtaining the injunction in the Denver Court, the Promoters continued their litigation efforts in Mexico to invalidate the assignment of the Hotusa

lien to Debtor without repaying his $5.5 million. ROA Vol. I, part 3, p.1151. When Debtor filed an opposition brief in Mexico responding to an appellate brief of RCC, Promoters moved for a contempt citation in the Denver Court, falsely alleging that Debtor was continuing foreclosure proceedings in Mexico and was violating the injunction. The Denver Court found Debtor in contempt for violating the injunction. Vol. I, part 3, p. 464.

In the Order of Contempt on January 6, 2020, at the urging of Promoters, the Court went far beyond the obligations in the injunction. The Court ordered that Debtor return title of the Mustapha Parcels to RCC. *Id.* The Court ordered that Debtor not pursue any actions in Mexico which are inconsistent with RCC's ownership rights in the disputed properties. *Id.* The Court ordered that Debtor cease all actions for damages in Mexico related to the RCC litigation. *Id.* The Court fined Debtor $1,000 per day until he complied with these Orders. *Id.* The Court further held that pending compliance, Debtor would be confined to jail. *Id.*

Thus, the Court ordered Debtor who had won the litigation in Mexico, to surrender the property, reverse the decisions of the Mexican Courts, and stop participating in all actions in Mexico spawned by the litigation pursued unsuccessfully by RCC. This was all done without a trial in the Denver action and without repayment to Debtor of the $5.5 million he paid for the Hotusa lien.

Also in January 2020, the Denver Court scheduled a bifurcated trial. The first part of trial was confined to corporate governance. The Court sought to decide who could speak for RCC and PdC based upon their governing documents and the agreements of the parties. A second part of trial, yet to be scheduled, would consider the claims and defenses of the parties and a third part would consider damages. ROA Vol. I, part 3, p. 1158.

Debtor sought to attend the corporate governance portion of the trial scheduled on January 24, 2020, but there was an outstanding warrant for his arrest. On January 23, 2020, Debtor moved that the warrant be suspended so he could attend and participate in the trial. The Court denied the motion. Debtor therefore did not attend the hearing on corporate governance. Only Kneen and Flaherty were able to attend and to testify to their version of the events. *Id.*

On June 19, 2020, the Court issued its decision on the corporate governance phase of the trial. ROA Vol. I, part 3, p. 1157. The Court made findings related to the governance of RCC and PdC. Within the findings, the Court also found that Debtor had breached his fiduciary duty to PdC by paying the Hotusa lien and obtaining an assignment of the lien for himself. *Id.* The Court purported to find for Promoters on the claim of breach of fiduciary duty although no trial on liability had

been convened and Debtor had been prevented from attending the trial on corporate governance.

In their pleadings in the Denver Action, Promoters sued Debtor for damages. ROA Vol. I, p. 412. The election of PdC and its principals to seek damages precluded any claim of rescission. *See Unicure, Inc. v. Thurman*, 599 P.2d 925, 927 (Colo.App.1979). No claim of rescission was ever made by PdC or the Promoters in the Denver action. Having elected damages rather than rescission, PdC and the Promoters had no claim to disaffirm the assignment to Debtor and had no claim to the return of the Hotusa lien. *Id.* Any such claim would have required PdC or the Promoters to pay to the Debtor the $5.5 million the Debtor paid to acquire the lien. *See* Restatement of Restitution, § 192 cmt 1.

On August 18, 2020, Promoters moved for an ex parte temporary restraining order to prevent Debtor from disposing of his assets. ROA Vol. I part 3, p. 89. Within the motion, Promoters made allegations that Debtor was taking his assets and family to Poland and requested a Writ of Attachment. ROA Vol. I, part 3, p.92, ¶ 14.

The allegations were verified only by the Affidavit of Promoters' counsel made on information and belief. Counsel had no knowledge of the allegations. An affidavit made on information and belief cannot support a Writ of Attachment and

any such Order is void. *See Jayne v. Peck*, 395 P.2d 603, 604 (Colo. 1964); and *Colorado Vanadium Corp. v. Western Colorado Power Co.*, 213 P. 122, 123 (1923).

The Court granted the motion to issue a Writ of Attachment on August 28, 2020, at an undisclosed ex parte hearing. The Court also ordered that Debtor not dispose of his assets, which effectively prevented Debtor from operating his business.

A Writ of Attachment is directed by statute to the Sheriff. However, no Writ was ever issued. An Order entitled Temporary Restraining order and Writ of Attachment was signed by the Court. This was not a Writ of Attachment. It was not a Writ. It was not directed to the Sheriff. It did not command the Sheriff to seize and hold any property of the defendant. It never made its way to the Sheriff and was never executed nor returned by the Sheriff.

In August 2021 the Denver Court jailed Debtor for not purging his contempt. ROA Vol. I, part 3, p.464. Debtor was jailed for not surrendering his $5.5 million lien to Promoters for no consideration. Legally, Promoters had no claim to the lien. Promoters litigated the dispute, not through an honest and properly convened trial. There they would have lost on all issues. Promoters instead litigated through the contempt power of the court, where the court merely assumed that Debtor had

defrauded Promoters and ordered him to restore the Hotusa lien to Promoters who had no legal claim to it.

The Court did agree to free Debtor several weeks later, but re-incarcerated him in January 2022 for not surrendering his lien in Mexico. Debtor remained in jail six weeks later when the rescheduled damage hearing was set to commence.

The week before the damage hearing, Debtor contracted COVID 19 while in jail and was put in isolation. ROA Vol. V, Tr (6/29/22), 103:1-4. Debtor was unable to attend a damage hearing in Court and was unable to meet with his attorneys to prepare testimony for the hearing. Debtor moved to continue the damage hearing, but the Court declined the request, later commenting that Debtor could have "attended" the hearing from his jail cell. It was at this juncture that Debtor, facing the prospect of trying to defend against millions of dollars of made-up damage claims from a jail cell while suffering with COVID, filed his Petition for relief under chapter 11 of the Bankruptcy Act.

After the filing of the Bankruptcy Petition, the Promoters moved for relief from stay complaining that Debtor filed the Petition on the eve of the damage hearing. The Bankruptcy Court granted relief from stay for the Promoters to liquidate their claim. The matter of damages was returned to the Denver Court which conducted a hearing on the damage claims and awarded damages in excess of twenty

million dollars for the claim of breach of fiduciary duty which had never been the subject of a proper trial.

Like the finding of liability, the damage findings are subject to significant appellate issues. PdC the shareholder of RCC, claimed to be damaged when Debtor paid $5.5 million for an assignment of the Hotusa lien. RCC had tried to sell its three properties for more than two years with professional commercial real estate brokers. RCC was unable to sell its properties, having received no offers which it recommended to its owner and managers. In December 2016 when the Hotusa lien was required to be paid, the best offer received by RCC for its three properties and for the adjacent beach house was $15 million. ROA Vol. I, part 3, p. 1131.

The claim of PdC was that when Debtor purchased the Hotusa lien, RCC was deprived of the opportunity to pay off Hotusa and sell the two Mustapha parcels. According to Promoters' own figures in the damages hearing, the proceeds of a $15 million sale would have been disbursed in the amounts of $1.8 million for costs of sale and $1.5 million to the owners of the beach house, leaving $11.7 million divided among the three RCC properties. Proceeds from the two properties subject to the Hotusa lien would thus have been $7.8 million (2/3 of 11.7). Deducting $5.5 million which had to be paid to Hotusa, the net proceeds from the sale of the two properties encumbered by the Hotusa lien in a $15 million sale of the four Mexican properties

would have been only $2.3 million. In other words, RCC would have failed to realize $2.3 million from a lost opportunity to sell the two parcels encumbered by the Hotusa lien in December 2016.

PdC would not have benefitted from the proceeds of 2.3 million from the sale of the two Mexican properties because it had borrowed $12 million to acquire and attempt to develop the Mexican properties. With interest on the loans, PdC owed more than $26 million to its lenders at the end of 2016 in addition to the $5.5 million owing on the Hotusa lien.

With no equity in the Mustapha Parcels, RCC and PdC suffered no damages from the loss of the property. *See Hooper v. Musolino*, 234 Va. 558, 570, 364 S.E.2d 207, 213 (1988) ("Because the partnership had no equity in the property, it lost nothing in the foreclosure. Accordingly, we will reverse that portion of the decree that awarded the partnership damages for the unencumbered value of parcel A."); *St. Paul at Chase Corp v Manufacturers Life Ins Co*, 262 Md. 192, 241-244; 278 A.2d 12 (1971) (breaching party's refusal to finance entitled property owner to recover for loss of equity, but because owner had no equity it could recover no damages for loss of building); *Nouri v. Mortg. Lender Servs.*, No. B236415, 2012 Cal. App. Unpub. LEXIS 7915, at *18 (Oct. 30, 2012) ("plaintiffs' [allege] that they were damaged by respondents' conduct because they lost their equity in the property.

There simply was no equity to lose. Therefore, plaintiffs' claims for damages properly were dismissed."); *Hutson v. Am. Home Mortg. Servicing*, No. C 09-1951 PJH, 2009 U.S. Dist. LEXIS 96764, at *29 (N.D. Cal. Oct. 16, 2009) ("If the value of the house did not exceed the amount of all secured claims, plaintiffs lost no equity and thus suffered no damages as a result of the sale.")

Yet, the Denver Court found that PdC had been damaged in an amount exceeding $20 million, including $5 million of punitive damages and $2.3 million representing the carrying costs of all four properties while RCC pursued its unsuccessful litigation in Mexico. The Denver Court having struck the Debtor's claims and defenses wouldn't consider the amounts owed by PdC to the Debtor based upon loans made to PdC for the project. (*See* Exhibits VVV and YY, attached hereto.) Those loans with interest exceed $21 million, a similar amount to the amount of damages that the Denver Court ordered against the Debtor.

**D.     The Proceedings in the Bankruptcy Court**

The Promoters, as creditors in Bankruptcy, filed the instant Motion to Convert the Chapter 11 to Chapter 7 on May 6, 2022. As grounds for the Motion to Convert, Promoters alleged that the Chapter 11 Petition was filed in bad faith as demonstrated by the orders of the Denver Court.

Promoters alleged no bad faith in the post-petition actions of the Debtor. As their allegations of bad faith, Promoters alleged the same fraudulent scheme they had alleged in the Denver Court – that Debtor had acted secretly and behind their back to formulate a development plan, to have Mexican counsel appear in Court for RCC to confirm the Settlement Agreement which Promoters had concluded with Hotusa, and to secretly obtain an assignment of the Hotusa lien. In addition, Promoters alleged bad faith in the timing of the Petition, being the week before the damage hearing scheduled in Denver Court.

Debtor responded to the Motion to Convert denying bad faith in the Denver Court and denying that the Petition was filed in bad faith. Debtor responded that the Orders of the Denver Court were entered without jurisdiction, in violation of Debtor's right to Due Process of Law, and based upon the falsifications of Promoters. Debtor responded that the allegations fit neither the statutory emblems of bad faith nor the factors enunciated in *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996).

The Bankruptcy Court held an evidentiary hearing on the Motion to Convert. Promoters presented no testimony. They merely submitted the Orders of the Denver Court to bolster their argument that the Debtor had acted in bad faith in the Denver litigation. They claimed that Defendant was a fraud and a cheat and sought to equate

the alleged bad faith in the state court litigation with bad faith in filing the Chapter 11 Petition. The only allegation of bad faith in the filing of the Petition was the timing of the filing, when the Debtor was going to have to try to defend against a multi-million-dollar damage claim in his jail cell while suffering from COVID 19.

On September 23, 2022, the Bankruptcy Court granted the Motion to Convert, finding that the Debtor acted in bad faith in the Denver Court and used the Bankruptcy Petition to reverse the state court proceedings and to secure his release from jail without purging his contempt. The Bankruptcy Court concluded that the Bankruptcy Estate was essentially a two-party dispute and the Plan of Reorganization was likely incapable of confirmation.

## IV.   SUMMARY OF ARGUMENT

To determine the bad faith of a Debtor in bankruptcy, the Courts determine whether the Debtor filed his Petition to achieve a valid bankruptcy purpose or to delay and harass the creditors. Here, the Debtor cannot be said to have harassed the creditors. The creditors have engaged in a false and malicious four-year campaign in the Denver Court to harass the Debtor and deprive him of his constitutional rights.

While the pre-petition conduct of the Debtor may be relevant in the determination of the intentions of the Debtor in filing his Petition in Bankruptcy, that conduct does not equate to a bad faith filing, especially when the orders of the

state court were obtained by creditors' own false allegations. Rather, the overriding inquiry is whether the Petition was filed for a valid bankruptcy purpose. If so, even a cataclysmic result in state court would not establish bad faith. If the Petition were filed for a valid bankruptcy purpose, it is not a bad faith filing.

Case law has provided factors to consider in the evaluation of whether a petition for bankruptcy relief is made in bad faith. Each factor may be instructive but no one factor is determinative. The Bankruptcy Court must evaluate the facts and circumstances of each case in determining whether a filing is made in bad faith. In its ruling, the Bankruptcy Court misconstrued the evidence and its analysis of some of the factors was incorrect, leading to an improper conclusion.

Here, the Debtor does not ask the Court to reverse the orders or judgment of the state court. Those orders will be challenged in a state court appeal when a final judgment enters. The Debtor seeks to maintain the going value of his real estate investments and avoid their sale for liquidation value. The Debtor seeks to level the playing field with all of his creditors. These are valid uses of the jurisdiction of the Bankruptcy Court.

Even if the alleged pre-petition conduct could be equated to a filing made in bad faith, the Court must consider unusual circumstances under Section 1112(b). The Bankruptcy Court found that the Plan of Reorganization likely could not be

confirmed, but ignored the unusual circumstances of the Debtor having been unable to operate his businesses for the past two years. The Court failed to consider that the Debtor retained ownership of the Hotusa lien and its completed foreclosure on two beachfront parcels of Mexican property worth $9 million in 2016. The Court also ignored the setoff claims of the Debtor against the claim of RCC for monies loaned to the development project by the Debtor, which setoff is now worth more than $21 million.

## V.    ARGUMENT

### A.    The Bankruptcy Court Erred in Finding Bad Faith in the Filing of the Petition

#### 1.    *Standard of Review*

The decision of the Bankruptcy Court to dismiss or convert a chapter 11 petition as a bad faith filing is reviewed for abuse of discretion. *See, for ex., NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (10th Cir. 2004) .

> An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 159 (3d Cir. 1999). An abuse of discretion, is shown if the bankruptcy

court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990).

The issues pertaining to the bad faith of the Debtor were preserved in Debtor's Objection to the Motion to Convert. ROA Vol. I, part 2, p. 215.

### 2. *Distinguishing Good Faith from Bad Faith Filings*

A bad faith filing is cause for dismissal under Section 1112(b)(1). *See Udall v. FDIC (In re Nursery Land Dev., Inc.)*, 91 F.3d 1414 (10th Cir. 1996). Because good faith is required in the commencement and prosecution of a chapter 11 case, "the lack thereof constitutes 'cause' for dismissal under *§ 1112(b)(1)*." *Sullivan v. Harnisch*, 52 B.R. 604, 615 (9th Cir. Bankr App. Panel 2014).

While various cases have identified elements to consider in determining whether a Bankruptcy Petition was filed in bad faith, the Court in *In re Bullseye Energy, LLC*, 2020 Bankr. LEXIS 3289, 2020 WL 6928198 (2020) described the analysis as follows:

> When Chapter 11 relief is sought for an improper purpose, i.e., to unreasonably deter, hinder or harass creditors, rather than to achieve the legitimate objectives of Chapter 11, i.e., to preserve a business as a going concern or to maximize the value of the estate for the benefit of creditors, a court may conclude that a Chapter 11 case was filed in bad faith.

*See also Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) ("…the two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors") *and Sullivan v. Harnisch*, 52 B.R. 604, 617 (9th Cir. Bankr App. Panel 2014) ("Good Faith is lacking only when the debtor's actions are a clear abuse of the bankruptcy process.").

Creditors PdC, Kneen and Flaherty contend in their motion that the prospect of an immediate judgment in the Denver Court was the impetus for this bankruptcy filing which only served to frustrate or delay their collection against Debtor. First, there was no threat of an immediate judgment since the cross claims were a part of a larger case which hasn't been completed making all orders on the cross claims interlocutory. However, the timing of filing is not determinative. *See Sullivan v. Harnisch*, 52 B.R. 604, 615-616 (9th Cir. Bankr App. Panel 2014):

> Debtor's petition, filed within 89 days of perfection of Appellees' judgment lien, not only appropriately provided Debtor a breathing spell, it laid the ground work for another key goal underlying the bankruptcy process, leveling the playing field for other creditors of the estate. *See In re Superior Siding & Window, Inc.*, 14 F.3d at 243.

Case law reflects that often Bankruptcy Cases are filed as a result of or anticipating adverse judgments and collection in state court actions. It is not unusual to encounter a chapter 11 case filed "because of the crushing weight of a judgment."

*Sullivan v. Harnisch*, 52 B.R. 604, 615 (9th Cir. Bankr App. Panel 2014), quoting *In re Marshall*, 298 B.R. 670, 683 (Bankr C. D. CA 2003).

To determine bad faith, the Courts look to whether there are valid bankruptcy purposes to be obtained by the Debtor or whether the Debtor uses the Bankruptcy to thwart collection efforts where no plan of reorganization is possible, where there are not more than a few creditors, and the matter can be better resolved in state court. *Compare In re Copperas Creek, Ltd. Liab. Co.*, 2012 Bankr. LEXIS 3463 with *In re Ford*, 2013 Bankr. LEXIS 2317.

Creditors presented no evidence that the bankruptcy filing had any purpose other than to provide the Debtor an appropriate breathing spell and to level the playing field among all of Debtor' creditors. *See Sullivan v. Harnisch*, 52 B.R. 604, 615-616 (9th Cir. Bankr App. Panel 2014). Instead, creditors merely relied on the orders of the Denver Court and asked the Bankruptcy Court to infer that the falsely-obtained orders in state court demonstrated bad faith in the Bankruptcy Court.

According to Debtor, he wishes to preserve the ongoing nature of his real estate investments while providing a 100% plan to satisfy all of his creditors. ROA, Vol. V, Tr 108:10-16. These are proper uses of the Bankruptcy Court.

As the Ninth Circuit Bankruptcy Appellate Panel observed in *Harnisch, supra:*

24

> All the evidence before the bankruptcy court indicated that Debtor had significant financial need for protection under the Bankruptcy Code. No evidence was presented from which the bankruptcy court could infer that Debtor intended to unreasonably deter or harass Appellees or any of his other creditors.

The satisfaction of the good faith requirement is a fact intensive inquiry requiring an examination of the totality of the facts and circumstances. *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (10th Cir. 2004). The burden is upon the movants to establish cause for dismissal. *See In re Bullseye Energy, LLC., supra; and see In re Jet Sales West LLC*, 2021 Bankr. LEXIS 3448.[4]

### 3. The Bankruptcy Court Wrongfully Equated the Orders of the Denver Court with Bad Faith in Filing Debtor's Petition

The Orders from the Denver Court were falsely obtained by the Promoters in disregard of the due process rights of the Debtor. The various orders were described in the Statement of the Case above, and are summarized here.

The Denver Court issued a temporary restraining order in January 2019 preventing the Debtor from completing a foreclosure on the two parcels of Mexican

---

[4] *But see NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (10th Cir. 2004) "…the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith [citations omitted]."

Property. In their application for an injunction the Promoters asked to maintain the status quo in Mexico pending the outcome of the litigation in Denver. However, upon receiving the injunction Promoters caused RCC to continue its appeals to invalidate the assignment of Debtor's lien. In Mexico, Debtor's counsel filed a brief in February 2019 in opposition to RCC's latest appeal.

Promoters sought an order of contempt in the Denver Court, based upon the false allegation that the Debtor was continuing his foreclosure in Mexico. The Denver Court held the Debtor in contempt, fined him $1,000 per day, and ordered him jailed until he surrendered the Hotusa lien to Promoters for no consideration. Whereas the Bankruptcy Court found the order of contempt to be proof of the bad faith of the Debtor, it is truly proof of the harassment suffered by the Debtor at the hands of the Promoters in the Denver Court and not indicative of bad faith.

The Denver Court struck Debtor's claims and defenses based upon the false allegation that the Debtor failed to produce more than 14 documents. ROA Vol. I, part 3, p. 484. However, two months prior to the motion of Promoters, the Debtor had in fact produced 1,100 documents containing 9,500 pages. ROA Vol. I, part 3, p. 1126. Whereas the Bankruptcy Court found this to be proof of the bad faith of the Debtor, it is truly proof of the harassment which the Debtor suffered at the hands of the movants in the Denver Court.

The Denver Court issued an order after ex parte hearing in August 2020 restraining the Debtor from transferring or disposing of his assets and granting a Petition for a Writ of Attachment. The order was based upon the false allegation that the Debtor was about to move his assets and his family to Poland.

No Writ of Attachment may issue without an affidavit setting forth (1) that "the defendant is indebted to the plaintiff" and (2) "setting forth facts showing one or more of the causes of attachment" under the rule. C.R.C.P. 102(b). The Affidavit in support of a Writ of Attachment must show "in specific factual detail within the personal knowledge of the affiant" that there is a reasonable probability that one of the causes for an attachment in the rule exist. C.R.C.P. 102(c).

"The affidavit must combine the allegation of indebtedness with the allegation of cause. If either is entirely absent, there is no more power to issue the writ than if there were no affidavit at all." *Axelson v. Columbine Laundry Co*., 81 Colo. 254, 258-59 (Colo. 1927) (emphasis added). This requirement is not satisfied by allegations upon information and belief. *Colo. Vanadium Corp. v. Western Colo. Power Co*., 73 Colo. 24, 213 P. 122 (1924). Whereas the Bankruptcy Court found this to be proof of the bad faith of the Debtor, it is truly proof of the harassment suffered by the Debtor at the hands of the Promoters in the Denver Court and not indicative of bad faith.

The exhibits submitted by the Promoters in the hearing on their motion to convert featured the several orders of the Denver Court described above which the Promoters contended were evidence of the bad faith of the Debtor. The Bankruptcy Court accepted the Promoter's proposition that it was the Debtor's conduct rather than the Promoters gaming the system which was the genesis of the orders from the Denver Court. In doing so, the Bankruptcy Court mis-perceived the main evidence of bad faith relied upon by the Promoters.

While it is true that the Debtor may not come to bankruptcy court to appeal the decisions in state court, where the creditors contend that the proceedings in state court prove bad faith, the Court should evaluate the conduct of the Debtor to determine if the Debtor acted in bad faith as alleged.

The Bankruptcy Court was so swayed by the orders of the Denver Court, that it failed to consider if the filing of the Petition served a valid bankruptcy purpose.

### 4.     *The Bankruptcy Court Wrongfully Found Bad Faith in the Timing of the Filing of the Bankruptcy Petition*

The Bankruptcy Court in its analysis of the circumstances surrounding the filing of the Bankruptcy Petition, found that Debtor had filed his Bankruptcy Petition on the eve of the damage hearing and took that as an indicium of bad faith. In context however, Debtor who was sitting in jail and unable to meaningfully participate in the damage hearing did not file to avoid the hearing. Debtor filed at that time because

he was about to be again deprived of the opportunity to participate in a hearing in any meaningful fashion.

A week prior to the damage hearing in February, Debtor contracted COVID 19. ROA Vol. V Tr (6/29/22) 103:1-4. Debtor was confined to isolation without access to his counsel and without access to the courthouse. Debtor moved to continue the damage hearing until he could meaningfully participate. The Court refused, later commenting that Debtor could attend remotely from isolation in jail.

This was a hearing in which PdC and the Promoters sought $30 million in damages. Before the damage hearing could proceed in Debtor's absence, he filed his Bankruptcy Petition.

The Bankruptcy Court was especially concerned with the allegation that the Bankruptcy Petition was instrumental in freeing the Debtor from incarceration without purging his default. However, the injunction and the contempt orders to enforce the injunction were all directed to the pre-trial conduct of the Debtor in state court. Once the damage hearing (and thus the trial) was completed, the injunction would dissolve[5] as would the contempt orders entered to enforce it. Whether or not the Petition was filed, the Debtor would have been freed from incarceration after the

---

[5] *See Rathke v. McFarland*, 648 P.2d 648, 651 (Colo.1982) (a preliminary injunction is designed to Protect a Plaintiff from irreparable injury and to preserve the power of the District Court to render a meaningful decision following trial.)

damage hearing in any event. The freedom of the Debtor was not the reason for the filing of the Petition.

Whereas the Bankruptcy Court found the timing of the Bankruptcy Petition to be proof of the bad faith of the Debtor, it is truly proof of the harassment suffered by the Debtor at the hands of the Promoters in the Denver Court and not indicative of bad faith.

### 5. *In Evaluating Other Factors from In Re Laguna Associates, the Bankruptcy Court Made Findings Unsupported by the Evidence*

Courts have withheld protection in Bankruptcy for a Petition filed to frustrate and harass a creditor. However, in this case, it was the creditors who were responsible for the frustration and harassment of the Debtor. The Debtor's resort to bankruptcy to escape the harassment of these creditors and level the playing field among all creditors is not bad faith. Also maintaining Debtor's assets as a going concern rather than sacrificing them at liquidation value is not bad faith.

The creditors caused the Denver Court to find liability in a trial convened only to determine corporate governance at which the Debtor was prevented from attending. They caused the Court to strike the Debtor's claims and defenses based upon a false claim of discovery violation. They caused the Court to hold the Debtor in contempt and fine him $1,000 per day based upon the false allegation that Debtor was continuing foreclosure actions in Mexico. They caused the Court to freeze the

Debtor's assets based upon a false claim that he was moving to Poland. Finally, they even succeeded in having the Debtor incarcerated for not returning to the creditors the Hotusa lien which they didn't pay for and had no legal right to obtain.

These are the orders submitted to prove that the Bankruptcy filing was made in bad faith. If anyone was acting in bad faith it was the creditors.[6]

In its analysis, the Bankruptcy Court applied an eight-factor test from *Laguna*. The findings made by the Bankruptcy Court were unduly influenced by the orders of the Denver Court. The findings of the Bankruptcy Court were not supported by the evidence and as corrected would not support a finding of bad faith.

The Bankruptcy Court conceded that the first factor was inapplicable since Debtor's was not a single-asset bankruptcy.

In evaluating the second factor involving the pre-petition conduct of the Debtor, the Bankruptcy Court found that Debtor committed fraud and breached his fiduciary duties. However, no fraud was ever proved and no finding of liability in fraud was made in the Denver Court. The only allegations of fraud were contained in the over-zealous motion practice of the Promoters in the Denver Court and in the

---

[6] This is not a case where the Debtor is asking the Bankruptcy Court to reverse the decisions of a state court. The decisions of the state court will be appealed in state court. The Debtor asks to administer his assets while payments to all debtors in accordance with their allowed claims are ratably paid.

Bankruptcy Court. In the only trial proceeding with all parties participating in the Denver Court, the allegations of fraud were disproved.[7]

The only order determining liability of the Debtor was the Order of the Denver Court after the trial that Debtor was prevented from attending and which was convened only on the issue of corporate governance. In fact, Debtor could not have breached his fiduciary duties to RCC by usurping a business opportunity because RCC was unwilling and unable to pay the HOTUSA lien. The unwillingness of PdC's principals to pay the lien was supported by the contemporaneous written documents produced by the Promoters. ROA Vol. I, part 3, pp. 1147-1149.

The inability of RCC to pay the Hotusa lien without selling its properties was also confirmed by the conduct of the parties. Debtor could not preclude RCC from paying off the Hotusa lien. Debtor merely obtained an assignment of it. If RCC were

---

[7] At the damage hearing in April, Roberts finally had an opportunity to confront the Promoters concerning the oft-published claims of fraud and the secret "stealing" of the Hotusa lien. Whereas the Promoters had filled their state court filings with incendiary allegations of a secret scheme to divest RCC from the opportunity to pay Hotusa and sell the properties, witness Kneen admitted that on December 13, 2016, he had discussions with Roberts about Roberts paying the Hotusa lien himself. Kneen retreated to the false claim that the payment would be made for RCC, which story was contradicted by Kneen's email the next day acknowledging that Roberts would purchase the Hotusa lien personally and proposing that Roberts would thereafter contract with RCC to do a development deal. ROA Vol. I, part 3, pp. 1140-1141.

able to pay the lien, it had every right to do so regardless of who the owner was at the time of payment.

RCC did not attempt to pay the lien in December 2016 or thereafter in the six years in which the parties were fighting. RCC was in liquidation and had no business plan. ROA Vol. I, part 3, pp. 1131-1132. Debtor could not usurp an opportunity which RCC could not pursue. If Debtor had been allowed to participate in a trial on liability after discovery, the absurdity of the position of PdC and the Promoters would have been obvious.

Whereas the Bankruptcy Court found the order of liability in a trial which the Debtor could not attend to be proof of the bad faith of the Debtor, it is truly proof of the harassment suffered by the Debtor at the hands of the Promoters in the Denver Court and not indicative of bad faith.

In evaluating the third *Laguna* factor, the Bankruptcy Court found that PdC and its principals would be the only significant unsecured creditor. The Bankruptcy files reveal that there are 18 creditors in addition to PdC and its affiliates, with claims in excess of $4.2 million. After setoff as described in the sections below, the amounts owing to RCC or PdC would be less than the amounts owing to the other creditors. Therefore, after applying the setoff for the loans made by the Debtor to PdC for the project, PdC or RCC would not be the only significant unsecured creditor.

33

The Bankruptcy Court improperly analyzed the fourth factor which asks if an imminent foreclosure on the debtor's property was stopped by the filing of the Petition? The Bankruptcy Court found that the Debtor's property had been attached by PdC and equated the attachment lien to an imminent foreclosure. This finding is unsupported by the evidence.

The Denver Court did grant a Petition for Writ of Attachment. The granting of the Petition conferred no lien. A Writ of Attachment is a writ directed to the Sheriff and commanding the Sheriff to seize the assets of the defendant in the County. C.R.C.P. 102(e). A Writ of Attachment as contained in Rule 102 C.R.C.P. is the only means of attaching the property of a defendant prior to judgment. C.R.C.P. 102(a). An attachment lien is created by the levy and execution of the Writ by the Sheriff. It is not created by the mere issuance of the Writ:

> It is well settled that no lien is created by the issuance of the attachment writ; that such lien can only be created by a valid levy. It is not the writ, but the levy of the writ by the actual seizure of the property, which constitutes the attachment.

*Crisman v. Dorsey*, 21 P. 920, 924 (Colo. 1889). Execution of the writ serves as a lien on specified property. *Bernhardt v. Commodity Option Co*., 528 P.2d 919, 921 (Colo. 1974).

In this case, no evidence was presented that a Writ ever issued. No Court Order was presented in which the Denver Court commanded the Sheriff to seize property of the Debtor. No evidence was introduced that the Sheriff acted on the attachment order granting the Petition for a Writ. No evidence of a levy was presented and no evidence of execution on any of the property of the Debtor was presented. Thus, no attachment lien was created and although PdC and the Promoters claim a lien on all of the assets of the Debtor, they have no such lien. In the fourth factor, the Bankruptcy Court equated the falsely-claimed attachment lien to a pending foreclosure. The court was incorrect in assessing the fourth factor.

The fifth *Laguna* factor involves the timing of the filing, and was addressed above. While the Bankruptcy Court found that the damage hearing was continued three times, the first was for the Court to consider important constitutional and due process issues raised by new counsel for the Debtor in 2020. *See, e.g.*, ROA Vol. I, part 3, pp. 489 and 499. The second continuance was to accommodate creditor's counsel who had a health issue. The third continuance was due to the incarcerated Debtor who was exposed to COVID 19 and unable to attend and meaningfully participate in the hearing. All parties stipulated to the continuance. No bad faith was thereby shown.

The sixth factor involves a determination of whether the Bankruptcy filing allowed the Debtor to evade court orders. The Bankruptcy Court made findings that the Bankruptcy filing secured his prompt release from jail without purging his contempt. The Bankruptcy Court misinterpreted the bad faith of the parties.

The Bankruptcy Court never inquired into the circumstances of the contempt or the flagrant violations of the constitutional rights of the Debtor who was jailed for not surrendering the lien that he purchased and to which the Promoters had surrendered their rights. Obtaining relief from overly aggressive creditors to balance the claims of all creditors is not bad faith.

Considering that the contempt order was itself obtained by the false allegation that the Debtor was continuing to foreclose in Mexico, no bad faith is implicated in obtaining the benefits of the automatic stay. Where orders are subject to significant concern, the Debtor's use of the benefits of the Bankruptcy Court do not show bad faith. That is after all what they are there for. *See In re Jet Sales West LLC*, 2021 Bankr. LEXIS 3448.

Neither did the Debtor attempt to evade the damage hearing. The Debtor welcomed the opportunity to show that PdC which had incurred $31 million of debt by 2016 had suffered no damage from losing the opportunity to sell $9 million (net

$2.3 million) of real estate. The Debtor didn't want to avoid the hearing, he merely wanted to participate in it. The Petition was not filed to evade court orders.

The seventh factor inquires whether the Debtor has no ongoing business or employees. The Court found that he does not, discounting the real estate investing and yacht charter businesses of the Debtor. However, real estate investing is a business just as Real Estate Investment Trusts carry on a business and are publicly traded in recognized securities markets. The Debtor may not have W-2 employees, but the Debtor did employ property managers to manage his real estate investments, yacht crew and until the Denver Court froze his assets, administrative personnel and bookkeepers.

The eighth factor inquires whether a chapter 11 plan is possible. The Bankruptcy Court ignored two sets of circumstances which would directly bear upon the feasibility of a chapter 11 plan. First, the Debtor still owns the lien upon two parcels of beachfront property in Mexico. The lien has been foreclosed, and the Courts of Mexico have confirmed Debtor's entitlement to the foreclosed lien.

The Court cannot at this stage of the proceedings determine that Debtor will not be able to propose a workable plan. *See In re Bullseye Energy, LLC*, *supra*. Debtor desires to work the Mustapha Parcels into his plan. PdC, Kneen and Flaherty have elected damages rather than rescission. ROA Vol. I, part 3, p. 412. Accordingly,

Debtor should have the opportunity to obtain the use and benefit of the Mustapha Parcels and work them into a Plan of Reorganization. Based upon actual offers received by the Promoters, the two beachfront properties were worth $9 million in 2016. ROA Vol. I, part 3, pp. 1131-1132. It is unknown what they may be worth today.

Secondly, the indebtedness claimed by RCC in excess of $20 million is offset by amounts that RCC owes to the Debtor based upon loans made by the Debtor as part of the mezzanine debt and as part of RM Funding. The debt owing to RM Funding and the mezzanine lenders totaled $53,467,887.69 as of December 2022[8]. The Debtor owns 38% of that debt equaling $20,317,797. In addition, the Debtor loaned $450,000 to RCC to extend the deadline of the payment to Hotusa in 2016. This debt at 8% interest, compounded annually would now be worth $770,000. If interest accrued at 18% compounded quarterly as contended by Kneen and Flaherty,[9] it would be worth $1,410,000. Thus, as of the end of 2022, PdC and RCC were indebted to the Debtor in an amount in excess of $21 million.

---

[8] Based upon the agreed interest rates extrapolated to the year 2022.

[9] *See* Exhibit YY, attached hereto.

PdC, Kneen and Flaherty do not have claims against the Debtor since as a shareholder of RCC, PdC has no direct claim against the Debtor. As members of entities which are members of PdC, Kneen and Flaherty have no direct claim against the Debtor.[10] Where the allegations of the complaint show that the loss, if any, was to all shareholders alike, the right to sue belongs to the corporation and may be brought by individual shareholders only as a derivative action. *Buechner v. Rouse*, 538 P.2d 117, 120 (Colo. Ct. App. 1975).

With additional assets of $9 million or more based upon the Mustapha Parcels and upon decreasing the debt claimed by PdC and Promoters by a $21 million setoff, the Bankruptcy Court was premature in finding that the Chapter 11 reorganization had little chance of confirmation.

Properly construed, the *Laguna* factors do not tend to show an improperly filed Chapter 11 Petition:

The Debtor's Petition is not a single asset bankruptcy;

---

[10] RCC has submitted a claim in the Bankruptcy Estate. However, it was submitted without an amount. RCC may attempt to claim damages in the amount of the interlocutory order of the Denver Court, but RCC was not a cross claimant in that action and did not receive an order that it was owed any money. Even if RCC has a claim in the amount of the interlocutory order of the Denver Court, it would also be subject to an offset for the loans made by the Debtor to PdC for the project.

The Debtor's pre-Petition conduct was not fraudulent and the Debtor was prevented from participating in the bifurcated trial resulting in the finding of liability;

PdC and its principals are not the only creditors;

There was no lien on the Debtor's assets in favor of PdC;

The timing of the Petition was meant to enable the Petitioner to attend and meaningfully participate in the damage hearing, not evade it;

Although the liability and damage orders of the Denver Court are largely suspect, the Petition is not filed to relitigate those orders. The Petition was filed to maintain the value of Debtor's assets as going concerns and to level the playing field among all of the creditors;

The Debtor does have ongoing business, the value of which would be decimated by liquidating the assets; and

Considering the value of the Mustapha Parcels and considering the setoff the Debtor has against PdC for loans made by the Debtor for the project, a Chapter 11 Plan of Reorganization would be feasible.

### 6.   *The Petition Was Filed for Valid Bankruptcy Purposes*

The Bankruptcy Court was misled by the orders of the Denver Court and failed to consider that the Bankruptcy Petition was filed for valid Bankruptcy purposes. Although the Debtor had a large claim against it being aggressively

asserted by PdC, Kneen and Flaherty in state court when the Petition was filed, the

Debtor testified that the Petition was filed to maintain his business assets as a going

concern, to pay all of his creditors ratably, and to even the playing field among his

creditors.

> Our cases have accordingly focused on two inquiries that are
> particularly relevant to the question of good faith: (1) whether the
> petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going
> concern or maximizing the value of the debtor's estate, and (2) whether
> the petition is filed merely to obtain a tactical litigation advantage. *SGL
> Carbon*, 200 F.3d at 165.

>> It is easy to see why courts have required Chapter 11
>> petitioners to act within the scope of the bankruptcy laws
>> to further a valid reorganizational purpose. Chapter 11
>> vests petitioners with considerable powers--the automatic
>> stay, the exclusive right to propose a reorganization plan,
>> the discharge of debts, etc.--that can impose significant
>> hardship on particular creditors. When financially
>> troubled petitioners seek a chance to remain in business,
>> the exercise of those powers is justified. But this is not so
>> when a petitioner's aims lie outside those of the
>> Bankruptcy Code. *Id.* at 165-66.

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated*

*Telecom Express, Inc.)*, 384 F.3d 108, 120 (10th Cir. 2004).

The timing of the Bankruptcy Petition and the potential for the entry of a large

judgment are not determinative if the Bankruptcy Petition is filed for a valid

Bankruptcy purpose. *Id.* In evaluating the indicia of bad faith from *In re Laguna,*

*supra*, the Bankruptcy Court failed to consider the purposes for the filing of the Petition.

Avoiding the damage hearing was never a goal of the Debtor, especially since the conclusion of the trial would terminate the injunction and the contempt orders to enforce it.

The Petition was not filed to reverse the orders of the Denver Court. Those orders will be the subject of an appeal when ripe. The Petition was filed to maintain the ongoing nature of the business assets and to level the playing field among all creditors.

The Bankruptcy Court has wide discretion in determining whether the Petition was filed in bad faith. *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989). However, in this case the Bankruptcy Court abused its discretion by misperceiving the pre-petition conduct of the Debtor based upon the orders of the Denver Court, by making findings unsupported by the evidence, and by failing to evaluate the legitimate purposes of the Petition.

### 7.    *The Bankruptcy Court Failed to Consider Unusual Circumstances*

Further, whether or not the Debtor is found to have filed his Petition in bad faith based upon his pre-Petition conduct, there are unusual circumstances which mitigate in favor of not dismissing or converting the chapter 11 filing to chapter 7.

Section 1112(b)(1) provides that if cause has been demonstrated, the Court must convert or dismiss the chapter 11 case "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of creditors and the estate." *In re Melendez Concrete, Inc*., No. 11-09-12334 JA, 2009 Bankr. LEXIS 2925 (Bankr. D.N.M. Sep. 15, 2009). "Unusual circumstances" contemplates circumstances not common in most chapter 11 cases and under which the purposes of the Bankruptcy Code would be better served by the case remaining in chapter 11. *Id.*

Debtor's freedom from incarceration and the potential of the Debtor to grow his business after the Denver Court wrongfully froze his assets both mitigate in favor of allowing the Debtor to seek plan confirmation. *See In re McTiernan*, 519 B.R. 860 (D. Wyo. 2014). The Denver Court acted in excess of its jurisdiction ordering the Debtor in 2020 not to encumber or dispose of any of its assets. Other than by Writ of Attachment, there is no jurisdiction for a District Court in Colorado to restrict a civil litigant from dealing with his assets.

The freeze ordered by the Denver Court was assumed by the Bankruptcy Court to be borne of the misconduct of the Debtor. ROA Vol. I, part 3, p. 1263 ("the writ of attachment only issued because of Roberts' improper conduct.") In fact, it was issued upon the baseless allegation of the creditors that the Debtor was moving

his assets and family to Poland. The freeze, the restriction on international travel ordered by the Denver Court, and Debtor's wrongful imprisonment had a material effect on Debtor's ability to run his business. ROA Vol. V, Tr (6/29/22) 100:1-15.

Further, the Debtor includes the Hotusa lien in his bankruptcy schedules. According to the Findings and Conclusions of the Denver Court the creditors sought the remedy of damages for the alleged breach of fiduciary duty. Accordingly, the creditors have waived any right to rescind the transaction in which the Debtor purchased the Hotusa lien. Thus, the lien and eventually the two Mexican beach front properties are properly assets of the estate. The courts of Mexico have previously determined that the Debtor is entitled to the assignment of the Hotusa lien.

Debtor has promptly filed an adversary proceeding to recover the Hotusa lien which can ripen into title of two beachfront properties. The Debtor desires to monetize these properties for the benefit of all of the creditors. ROA Vol. V, Tr (6/29/22) 108:7-18.The potential of obtaining and monetizing the Mexican property mitigates in favor of allowing the Debtor to seek plan confirmation *Id.*

The setoff claimed by the Debtor for the loans made by the Debtor to PdC for the project also present unusual circumstances and mitigate in favor of the Debtor being able to confirm a plan of reorganization.

The flagrant violation of the due process rights of the Debtor and the potential to appeal the orders of the Denver Court also presents unusual circumstances which mitigate in favor of the Debtor being able to confirm a plan of reorganization.

## VI.   CONCLUSION

The Order of the Bankruptcy Court converting this case to chapter 7 was mistaken as to material facts, failed to consider the causes of the Denver Court's orders, and failed to properly apply the law because the Court failed to consider the unusual circumstances of this Bankruptcy Case.

Because an analysis of the good or bad faith of the Debtor is factually intensive, this Court should not attempt to substitute its judgment for the judgment of the Bankruptcy Court. The judgment of the Bankruptcy Court should be vacated and this case should be returned to the Bankruptcy Court for further proceedings in conformance with the opinion of this Court.

Respectfully submitted this 20th day of January 2023.

PODOLL & PODOLL, P.C.
5619 DTC Parkway, Ste. 1100
Greenwood Village, CO 80111
Tel: (303) 861-4000
Fax: (303) 861-4004

By: */s/Robert C. Podoll*
    Robert C. Podoll
    Atty. Reg. #8775
    rob@podoll.net

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was served on January 20, 2023, upon all parties entitled to notice through the Court's CM/ECF filing system.

By: */s/Robert C. Podoll*