# Exhibit UUU

# AMENDED AND RESTATED
# LOAN AGREEMENT

THIS AMENDED AND RESTATED LOAN AGREEMENT ("Loan Agreement" or "Agreement") is made and entered into as of this 19th day of September, 2014 by and among RM FUNDING, LLC, a Colorado limited liability company, with its principal offices at 6955 Cordwood Court, Boulder, CO 80301 ("LENDER") and PdC, LLC, a Colorado limited liability company with its principal offices located at 1601 Blake Street, Suite 310, Denver, CO 80202 (the "Company").

## RECITALS

A.  On May 25, 2012, LENDER loaned Company Six Million Seven Hundred Six Thousand Dollars ($6,706,000) pursuant to a Loan Agreement dated May 25, 2012 ("Prior Agreement") which the Company and LENDER agree is being amended, restated and replaced in its entirety with this Agreement.

B.  The Company desires to borrow additional funds from LENDER, subject to and in accordance with the terms and conditions set forth in this Agreement in order to fund the projected overall operating, infrastructure and due diligence costs related to the potential sale or development of the real property owned by the Company.

C.  LENDER is willing to loan funds to the Company, subject to and in accordance with the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, in consideration for the funds made available and committed by LENDER to and on behalf of the Company as hereinafter identified, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

When used herein, the capitalized terms above shall have the meanings so stated and the following capitalized terms shall have the meanings ascribed to them below:

"2007 Parcel" means that certain real property located in Xpu Ha Beach in Playa del Carmen, Quintana Roo, Mexico and acquired by Riviera Country Club, S. de R.L. de C.V., a Mexican entity, in 2007, and consisting of approximately six (6) acres more or less.

"2012 Parcel" means that certain real property located in Xpu Ha Beach in Playa del Carmen, Quintana Roo, Mexico and acquired by Riviera Country Club, S. de R.L. de C.V., a Mexican

I

CONFIDENTIAL                                                                                                          PDC067473

Roberts_05696

entity, in 2012, and consisting of approximately twelve (12) acres more or less.

"Affiliate" means any Person (a) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, the Company, (b) which beneficially owns or holds 25% or more of any class of the voting equity of the Company, or (c) 25% or more of the voting equity of which is beneficially owned or held by the Company.

"Books and Records" means all books, records, computer tapes, disks, software and other records of the Company.

"Class D Interests" means the Class D Interests of the Company, as defined in the Fourth Amended and Restated Operating Agreement of PdC, LLC.

"Deed of Trust-2007 Parcel" means that certain Deed of Trust over the 2007 Parcel which will be recorded within thirty (30) days of this Agreement for the benefit of LENDER and the holders of the Mezzanine Financing.

"Deed of Trust-2012 Parcel" means that certain Deed of Trust (if requested by LENDER) over the 2012 Parcel which LENDER is entitled to place on such Property.

"Default" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"Default Rate" means a per annum rate of interest equal to the Interest Rate plus two percent (2%).

"Events of Default" shall mean those items described and defined in Article VII.

"Interest Rate-Loan One" means a per annum rate of interest equal to fifteen percent (15%) compounded quarterly.

"Interest Rate-Loan Two" means a per annum rate of interest equal to twenty-one percent (21%) compounded quarterly.

"Loan" shall mean the sum of all amounts due and owing to LENDER pursuant to the Note(s), including both the First Note and Second Note.

"Loan Documents" has the meaning given that term in Section 4.01 of this Agreement.

"Maturity Date-Loan One" means the maturity date of the First Note, which shall be the date which is forty-two (42) months from May 25, 2012 (which calculates to November 25, 2015).

"Maturity Date-Loan Two" means the maturity date of the Second Note, which shall be

March 31, 2016.

"Maximum Legal Rate" means on any day, the highest non-usurious rate of interest permitted by applicable law on such day, computed on the basis of the actual number of days elapsed over a year of 365 days.

"Maximum Loan Amount-Loan One" means an amount equal to Six Million Seven Hundred Six Thousand Dollars ($6,706,000) in the aggregate.

"Maximum Loan Amount-Loan Two" mean an amount equal to approximately Six Hundred Thousand Dollars ($600,000) in the aggregate.

"Note" means the Notes to be made and delivered by the Company hereunder, with each Note having a face amount equal to the amount of the Loan advanced by the Lender evidenced by such Note as it may from time to time be renewed, amended, restated or replaced. The First Note was made on or about May 25, 2012 with a principal amount of Six Million Seven Hundred Six Thousand Dollars ($6,706,000). The Second Note was made on or about the date hereof and shall have a maximum aggregate principal of approximately Six Hundred Thousand Dollars ($600,000).

"Obligations" means all liabilities and obligations of the Company to LENDER under and with respect to the Loan and the Loan and all renewals, increases, extensions, modifications, rearrangements or restatements thereof, and all other advances. The term includes, without limitation, all interest, charges, expenses, fees, attorneys' fees, and any other sums chargeable to the Company under any of the Loan Documents.

"Person" means an individual, partnership, corporation, trust, unincorporated organization, limited liability company or a government or agency or political subdivision thereof.

"Senior Indebtedness" has the meaning set forth in Section 2.06 herein.

## ARTICLE II
## LOANS

Section 2.01. Loans. On or about May 25, 2012, LENDER loaned Company Six Million Seven Hundred Six Thousand Dollars ($6,706,000) pursuant to the Prior Agreement and the First Note. Pursuant to this Agreement, LENDER hereby agrees to make an additional loan to the Company in accordance with the terms and conditions of this Agreement and the Second Note in the amount of up to Six Hundred Thousand Dollars ($600,000).

Section 2.02. Maturity Date. The entire outstanding principal amount of the First Note shall be due and payable in full on the Maturity Date-Loan One. The entire outstanding principal amount of the Second Loan shall be due and payable in full on the Maturity Date-Loan Two.

3

CONFIDENTIAL                              PDC067475

Roberts_05698

Section 2.03. <u>Interest Rate</u>. Interest on the First Note will accrue at the Interest Rate-Loan One or, if an Event of Default occurs, at the Default Rate. Interest on the Second Note will accrue at the Interest Rate-Loan Two, or if an Event of Default occurs, at the Default Rate. The Interest under the First Note shall be accrued for payment upon the Maturity Date-Loan One. The Interest under the Second Note shall be accrued for payment upon the Maturity Date-Loan Two. The Company shall have the right to repay or prepay the Loan(s) outstanding at any time and from time to time without penalty. In addition to the Interest Rate, LENDER, upon delivery of the loans funded for the First Loan hereunder, was issued Class D Interests in the Company as set forth in Article III herein.

Section 2.04. <u>Default Rate</u>. Upon and after the occurrence of an Event of Default and during the continuation thereof and from and after the applicable Maturity Date as otherwise set forth herein, the principal amount outstanding under the Note shall bear interest, compounded on an annual basis, at the Default Rate.

Section 2.05. <u>Maximum Interest Rate</u>. Regardless of any provision contained in any of the Loan Documents, LENDER shall never be entitled to contract for, charge, take, reserve, receive, or apply, as interest on the Loan, or any part thereof, any amount in excess of the Maximum Legal Rate, and, in the event LENDER ever contracts for, charges, takes reserves, receives, or applies as interest any such excess, it shall be deemed a partial prepayment of principal and treated hereunder as such and any remaining excess shall be refunded to the Company. In determining whether or not the interest rate paid or payable, under any specific contingency, exceeds the Maximum Legal Rate, the Company and LENDER shall, to the maximum extent permitted under applicable law, (a) characterize any non-principal payments as an expense, fee, profit participation or premium rather than as interest, (b) exclude voluntary prepayments and prepayments resulting from the exercise by LENDER of its remedies upon the occurrence of an Event of Default and, in each case, the effects thereof, and (c) "spread" the total amount of interest throughout the entire contemplated term of the Loan and underlying obligations. The parties have agreed the Loan, as set forth in this Agreement, does not violate the usury statutes of the state of Colorado. To the fullest extent permitted by applicable law, the Company hereby waives and agrees not to assert any defense to enforcement of the Loan Documents based on usury.

Section 2.06. <u>Subordination</u>. The payment of principal and interest under the First Note is expressly subordinated in right of payment to the prior payment of all Senior Indebtedness, which Senior Indebtedness is limited and defined to mean (a) all indebtedness secured by any mortgage, lien, security interest, pledge, charge or encumbrance on the 2012 Parcel, including but not limited to the Second Note; (b) all loan financing of the Company (other than Mezzanine Financing) obtained by the Company for purposes of development of the Sereno project (and defined as "Financing" by the Company) (c) all Senior Bank Financing obtained by the Company for purposes of development of the Sereno project (and defined as "Senior Bank Financing" by the Company) and (d) the principal amount of and all interest and fees on renewals, extensions and refunding related to the foregoing indebtedness. In addition to the foregoing, the Lender hereby recognizes, acknowledges and agrees that the First Note shall be treated on a

parri passu basis with the existing Mezzanine Financing of the Company; provided, however, that the Lender recognizes, acknowledges and agrees that a portion of the Senior Bank Financing and/or Financing of the Company may be used by the Company to make a priority repayment of $5.25 million of principal plus interest thereon on the Mezzanine Financing.

LENDER agrees to execute any and all documents reasonably required by a holder of Senior Indebtedness, including but not limited to, a subordination agreement, to evidence the relative priority of the interest of such holder of Senior Indebtedness to the LENDER.

Notwithstanding the foregoing, the Company shall pay and the LENDER shall have the right to receive and retain from the Company, principal and accrued interest owing hereon provided that at the time of such payment or immediately after giving effect thereto, there shall not exist with respect to any Senior Indebtedness a default or any condition, event of act that, with notice or lapse of time, or both, would constitute a default, unless waived.

Nothing contained herein is intended to or shall impair, as between the Company and the LENDER, the obligation of the Company, which is absolute and unconditional, to pay to the LENDER the principal of, and the interest on, the Loan in accordance with the terms set forth herein, or is intended to or shall affect the relative rights of LENDER and the creditors of the Company, other than the holders of Senior Indebtedness, nor shall anything herein prevent the LENDER from exercising all remedies otherwise permitted by applicable law upon any Event of Default hereunder, subject to the rights, if any, of the holders of the Senior Indebtedness, in respect of cash, property or securities of the Company received upon the exercise of such remedy. The Company shall give prompt written notice to LENDER of any fact known to the Company which, in the reasonable judgment of the Company, would prohibit the making of any payment of moneys pursuant to the provisions of this Loan Agreement.

Section 2.07. <u>Deed of Trust-2007 Parcel</u>. The Company shall, within thirty (30) days of execution of this Agreement deliver to LENDER and the providers of the Mezzanine Financing jointly, an executed first Deed of Trust-2007 Parcel for recordation in accordance with Mexican notarial requirements such that the LENDER and the Mezzanine Financing of the Company that is parri passu with the Loan shall collectively have a first mortgage lien securing the Company's obligations herein. Failure to cause the Deed of Trust to be executed and recorded shall be an express Event of Default herein for which there shall be no cure period. The Company shall indemnify and hold LENDER harmless from and against any intervening liens filed of record. Upon the consummation of Senior Bank Financing (or any Financing as detailed in Section 2.06(c)), the Company shall have the right to subordinate that Deed of Trust-2007 Parcel to the Senior Bank Financing or if required by the Senior Bank Financing, terminate the Dead of Trust-2007 Parcel.

Section 2.08. <u>Deed of Trust- 2012 Parcel</u>. The Company shall, within thirty (30)

5

days after the written request by the LENDER and so long as no Senior Bank Financing or Financing is in place, deliver to LENDER, an executed Deed of Trust- 2012 Parcel on the 2012 Parcel for recordation in accordance with Mexican notarial requirements such that the LENDER shall have a mortgage lien securing the Company's obligations herein. LENDER recognizes and acknowledges that it secured interest in the 2012 Parcel would be subject to that certain lien of record and in favor of the Spanish entity generally known as Hotusa ("Hotusa Lien"). Failure to cause the Deed of Trust-2012 Parcel to be executed and recorded shall be an express Event of Default herein for which there shall be no cure period. The Company shall indemnify and hold LENDER harmless from and against any intervening liens filed of record. Upon the consummation of Senior Bank Financing or any Financing as detailed in Section 2.06(b)) or the repayment of the Hotusa Lien, the Company shall have the right to immediately subordinate the Deed of Trust-2012 Parcel to the party(ies) providing such funding.

## ARTICLE III

## CLASS D INTERESTS

In addition to the other payments set forth herein, the Company, in exchange for the First Note, has issued to the Lender the Class D Interests in the Company. Upon consummation of the First Note, the Lender received full ownership of the Class D Interests in the Company with all rights and claims with respect to such Class D Interests as accorded the Class D Interests in the Company's Operating Agreement, which may be amended and modified from time to time.

## ARTICLE IV

## CONDITIONS PRECEDENT

The obligation of LENDER to provide the Loan(s) shall be subject to the following conditions precedent unless waived by LENDER in its sole discretion:

Section 4.01. Loan Documents. This Agreement and any other loan documents executed by the Company or LENDER in connection with the funds remitted for the First Note and the Second Note (collectively, the "Loan Documents") shall have been duly executed and delivered by the parties hereto, in a form reasonably acceptable to LENDER.

Section 4.02. Representations and Warranties. The representations and warranties contained in this Agreement and in any Loan Document shall be true and correct in all material respects.

Section 4.03. Compliance with this Agreement. The Company is in compliance with all covenants, agreements and conditions contained herein which are required to be performed or complied with by it.

## ARTICLE V

6

CONFIDENTIAL

PDC067478

Roberts_05701

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

As further consideration and inducement to LENDER to enter into this Agreement and to make and maintain the Loan(s), the Company hereby represents and warrants to LENDER, upon which representations and warranties LENDER is entitled to rely, that:

Section 5.01. Organization and Authority. The Company is, and shall continue to be, until payment in full of all Obligations, a Colorado limited liability company duly organized and validly existing under the laws of the State of Colorado. The Company has the proper authority to execute and deliver this Agreement, the Notes, and the Loan Documents, and each such document constitutes the valid and binding obligation of the Company, enforceable in accordance with its terms, and such documents have been properly authorized, executed and delivered. No further consent or approval from any third party is necessary or required for the Company's execution of the Loan Documents or the performance of the Company's obligations thereunder.

Section 5.02. Organizational Documents. To the best knowledge of the Company, complete and accurate copies of the Articles of Organization and the Operating Agreement of the Company in force as of the date of this Agreement.

Section 5.03. No Violations and Defaults. To the best knowledge of the Company, neither the execution of, nor the consummation of the transactions and borrowing contemplated by this Agreement nor compliance with the terms and provisions of this Agreement will conflict with, result in a breach of, or constitute a default under any of the terms, conditions or provisions of any contract, agreement, lease, indenture, mortgage, deed of trust, license or other instrument to which the Company is a party or by which it or any of its assets are or may be bound or affected or to which the Company is subject, or any law, regulation, rule, order, writ, injunction or decree of any court or agency or regulatory body, or cause any lien to attach to any Property of the Company.

Section 5.04. Taxes and Assessments. To the best knowledge of the Company, (i) the Company and its subsidiaries have filed all United States federal, state and local tax returns and Mexican federal state and local tax returns that are required to be filed and has paid all taxes shown on such returns and on all assessments received by it to the extent that such taxes and assessments have become due, and (ii) all federal and state income taxes and all other taxes and assessments of any nature with respect to which the Company and its subsidiaries are obligated have been paid when due, except where the failure to so file or pay would not have a material adverse effect.

Section 5.05. Material Fact. To the best knowledge of the Company, (i) there is no fact which the Company has failed to disclose to LENDER in writing which materially affects adversely or, so far as the Company can now foresee, will materially affect adversely the assets, business, prospects, profits or condition (financial or otherwise) of the Company or the ability of the Company to perform this Agreement and (ii) no information, exhibit or report furnished by the Company to LENDER in connection with the negotiation of this

7

CONFIDENTIAL                                                                                   PDC067479

Roberts_05702

Agreement contained any material misstatement of fact or omitted a material fact necessary to make the statement contained therein not materially misleading.

Section 5.06. No Default. There is no default on the part of the Company under this Agreement or any document executed by the Company in connection herewith and no event has occurred that with notice or the passage of time or both would constitute a default hereunder or under any such document.

## ARTICLE VI

## COVENANTS AND CONTINUING AGREEMENTS

During the term of this Agreement the Company covenants and agrees that, unless LENDER shall otherwise consent in writing, it shall:

Section 6.01. Filings. File all federal, state and local tax returns and other reports the Company is required by law to file and maintain adequate reserves for the payment of all taxes, assessments, governmental charges, and levies imposed upon it, its income, or its profits, or upon any assets belonging to it, except where the failure to so file or pay will not have a material adverse effect.

Section 6.02. Compliance with Laws. The Company will comply with all laws, ordinances, governmental rules and regulations to which it is subject, and obtain and keep in force any and all licenses, permits, or other governmental authorizations necessary to the ownership of the 2012 Parcel and the 2007 Parcel or to conduct its business, which violation or failure to obtain might materially and adversely affect the assets or condition (financial or otherwise) of the Company.

Section 6.03. Maintenance and Availability of Records. The Company shall cause the following items to be kept at the principal business office of the Company:

(a) A current list of the full name and last known address of each Member of the Company.
(b) A copy of the Articles of Organization of the Company, including all amendments thereto and executed copies of all powers of attorney pursuant to which the Articles or any amendment thereto has been executed.
(c) Copies of the Company's federal, state and local income tax returns and reports, if any, since inception of the Company.
(d) Copies of the Company's operating agreement, as amended, and copies of the Loan Documents hereto.

Section 6.04. Inspections. Upon reasonable notice, permit representatives of LENDER, from time to time, as often as may be reasonably requested, but only during normal business hours, to visit and inspect the assets of the Company, inspect and make extracts from its books and records, and discuss with the Manager.

8

CONFIDENTIAL                PDC067480

Section 6.05. General Indemnity. The Company shall indemnify, protect, and hold LENDER and its respective parents, subsidiaries, managers, members, officers, employees, representatives, agents, successors, assigns and attorneys (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses (including, without limitation, reasonable attorneys' fees and legal expenses whether or not suit is brought and settlement costs), and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Indemnified Parties, in any way relating to or arising out of the Loan, the Loan Documents or any of the transactions contemplated therein (collectively, the "Indemnified Liabilities"), provided, however, that although each Indemnified Party shall have the right to be indemnified from its own ordinary negligence, no Indemnified Party shall have the right to be indemnified hereunder for its own fraud, gross negligence or willful misconduct. The provisions of and undertakings and indemnification set forth in this Section shall survive the satisfaction and payment of the Loan and termination of this Agreement.

LENDER shall indemnify, protect, and hold the Company and its respective parents, subsidiaries, managers, members, officers, employees, representatives, agents, successors, assigns and attorneys (collectively, the "Company Indemnified Parties") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses (including, without limitation, reasonable attorneys' fees and legal expenses whether or not suit is brought and settlement costs), and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Company Indemnified Parties, in any way relating to or arising out of the Loan, the Loan Documents or any of the transactions contemplated therein (collectively, the "Company Indemnified Liabilities"), provided, however, that although each Company Indemnified Party shall have the right to be indemnified from its own ordinary negligence, no Company Indemnified Party shall have the right to be indemnified hereunder for its own fraud, gross negligence or willful misconduct. The provisions of and undertakings and indemnification set forth in this Section shall survive the satisfaction and payment of the Loan and termination of this Agreement.

Section 6.06. Indemnification. Any Person entitled to indemnification hereunder will (i) give prompt written notice to the Company or LENDER, as applicable, of any claim with respect to which it seeks indemnification and (ii) unless, based on written advice of counsel for the Indemnified Party or Company Indemnified Party, as applicable, a conflict of interest between the applicable Indemnified Parties and the Company or LENDER exists with respect to such claim, permit the Company or LENDER to assume the defense of such claim. The Company will not be obligated to pay the fees and expenses of more than one counsel for all Indemnified Parties with respect to such claim, unless, based on written advice of counsel for the Indemnified Party(ies), a conflict of interest exists between the applicable Indemnified Parties with respect to such claim. LENDER will not be obligated to pay the fees and expenses of more than one counsel for all Company Indemnified Parties with respect to such claim, unless, based on written advice of counsel for the Company Indemnified Party(ies), a conflict of interest exists between the applicable Company Indemnified Parties with respect to such claim.

Notwithstanding the foregoing, upon judicial determination that is final and no longer appealable, that the act or omission giving rise to the indemnification above resulted primarily out of or was based primarily upon the applicable Indemnified Parties or Company Indemnified Parties gross negligence, fraud or willful misconduct, the Company shall not be responsible for the applicable Indemnified Parties' Indemnified Liabilities sought or Company Indemnified Parties' Company Indemnified Liabilities to be indemnified herein, and the Company or LENDER, as applicable shall recover from such applicable Indemnified Parties or Company Indemnified Parties all amounts previously paid in full or partial satisfaction of such indemnity, together with all costs and expenses (including attorneys' fees) of the Company or LENDER reasonably incurred in connection with the Indemnified Parties' or Company Indemnified Parties' claim for indemnity.

Section 6.07. <u>Notice of Default and Adverse Developments</u>. Promptly upon becoming aware of the existence of any condition or event which constitutes an Event of Default or upon becoming aware of any development or other information which may materially and adversely affect the Company, the Company shall provide LENDER with a written notice specifying the nature and period of existence thereof and, if an Event of Default, what action the Company is taking or proposes to take with respect thereto.

ARTICLE VII

DEFAULT

Section 7.01. <u>Event of Default</u>. The occurrence of any one or more of the following events shall constitute an "Event of Default" for purposes of this Agreement:

(a) Any amount of principal or interest on the First Note or Second Note is not paid on or before the expiration of the 10th day after the due date thereof.

(b) Any representation or warranty made in this Agreement shall be false or inaccurate in any material respect at the time made.

(c) Failure to satisfy the conditions of Section 2.07 or Section 2.08, for which there is no cure period.

(d) The failure of the Company to comply with any other covenant contained in this Agreement not described in this Section 6.01 above if such non-compliance continues uncured for ten (10) business days or more after notice from LENDER.

(e) There is a material adverse change in or with respect to the Company's operations or with respect to the financial condition of the Company which continues uncured for fifteen(15) business days or more after notice from LENDER.

(f) The Company shall make an assignment for the benefit of creditors; file a

petition in bankruptcy; be adjudicated insolvent or bankrupt or admit in writing the inability to pay debts as they mature; petition or apply to any tribunal for the appointment of a receiver or any trustee or similar officer for the Company or a substantial part of the assets of the Company; or shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereinafter in effect; or if there shall have been filed any such petition or application, or any such proceeding shall have been commenced against the Company that remains undismissed for a period of 30 days or more; or the Company by any act or omission shall indicate its consent to, approval of or acquiescence in any such petition, application or preceding, or the appointment of a receiver of or any trustee or similar officer for the Company or any substantial part of any of the properties of the Company, or shall suffer any such receivership or trusteeship to continue undischarged for a period of 30 days or more; or any judgment, writ, warrant of attachment or execution or similar process shall be issued or levied against a substantial part of the property of the Company and
any such judgment, writ or similar process shall not be released, vacated or fully bonded within 60 days after its issue or levy;

   (g)   The Company engages (or omits to engage) in activities which constitute gross negligence in the management and operations of the Company which action or omission continues uncured for fifteen (15) business days or more after notice from LENDER.

   (h)   For purposes of the cure periods provided in Section 7.01(d), (e) and (g), in the event the Company has commenced a cure reasonably acceptable to LENDER within the applicable cure period and is diligently proceeding with such cure, the Company shall be granted such additional time as is reasonably necessary to achieve such cure, provided that such additional time shall not exceed twenty (20) business days without the written consent of LENDER.

   Section 7.02.   Remedies.

   (a)   Upon the occurrence of an Event of Default, the Loan(s) and all accrued interest and other amounts payable hereunder or under any of the Loan Documents shall at LENDER's sole option become due and payable without any further action on the part of LENDER. LENDER may proceed with every remedy available at law or in equity or provided for herein or in any document executed in connection herewith and all expenses incurred by LENDER in connection with any remedy shall be deemed indebtedness of the Company to LENDER and a part of the Obligations.

   (b)   No delay or failure of LENDER in the exercise of any right or remedy provided for hereunder shall be deemed a waiver of the right by LENDER and no exercise or partial exercise or waiver of any right or remedy shall be deemed a waiver of any further exercise of such right or remedy or of any other right or remedy that LENDER may have. The rights and remedies herein expressed are cumulative and not exclusive of any right or remedy that LENDER shall otherwise have.

11

CONFIDENTIAL

PDC067483

Roberts_05706

Section 7.03. Revival of Obligations. The Company hereby expressly agrees that if the Company makes a payment to LENDER which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, or otherwise required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such repayment, the obligations hereunder or any part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made.

## ARTICLE VIII

## REPRESENTATIONS AND WARRANTIES OF LENDER

Section 8.01. Authorization. This Agreement has been duly authorized by all necessary action on the part of LENDER and has been duly executed and delivered by LENDER, and is a valid and binding agreement upon the part of LENDER enforceable in accordance with its terms.

Section 8.02. Corporate Act and Proceedings. This Agreement has been duly authorized by all necessary corporate action and has been duly executed and delivered by an authorized manager of LENDER and is a valid and binding agreement upon the part of LENDER enforceable in accordance with its terms.

Section 8.03. Nontransferability. LENDER hereby agrees that, other than in the case of an Event of Default hereunder, the written consent of the Company shall be required for LENDER to transfer the Loan. In the event of an Event of Default, LENDER shall have the right to transfer, assign or pledge the Loan without the approval of the Company.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01. Amendments. No provision or term of this Agreement may be amended, modified, revoked, supplemented, waived, or otherwise changed except by a written instrument duly executed by the Company and LENDER and designated as an amendment, supplement or waiver.

Section 9.02. Notices. Any notice required to be given to any party pursuant to any provision of this Agreement shall be in writing, shall be given by certified mail, return receipt requested, or delivered by hand or overnight courier, and, if delivered by hand or overnight courier, shall be deemed received one (1) day after having been delivered and, if mailed, shall be deemed received three days after having been deposited in the United States mail, postage prepaid, addressed as follows:

if to the Company:
1601 Blake Street, Suite 310
Denver, CO 80202


if to LENDER:
6955 Cordwood Court
Boulder, CO 80301

Either party may change its address for the giving of notice by notice hereunder.

Section 9.03. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one or more instrument.

Section 9.04. <u>Headings</u>. The article and section headings herein are for convenience purposes only and shall not affect the construction thereof.

Section 9.05. <u>Entire Agreement</u>. This Agreement and the other Loan Documents constitute and incorporate the entire agreement between the Company and LENDER concerning the subject matter of this Agreement, and supersede any prior agreements between the Company and LENDER concerning the subject matter thereof.

Section 9.06. <u>Conflict</u>. If any term of any Loan Document entered into pursuant to this Agreement shall conflict with this Agreement, this Agreement shall govern to the extent of the conflict.

Section 9.07. <u>Use of Terms</u>. As used herein words in any gender shall be deemed to include the other genders and the singular shall be deemed to include the plural, and vice versa.

Section 9.08. <u>Parties, Successors, and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns (except that neither the Company nor LENDER shall assign, without the prior written consent of the other party hereto, any of its rights or obligations hereunder), and all representations, covenants, provisions and agreements by or on behalf of the Company which are contained in this Agreement shall inure to the benefit of the successors and assigns of LENDER.

Section 9.09. <u>Separability</u>. If any provision of this Agreement shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be impaired thereby, nor shall the validity, legality or enforceability of any such defective provisions be in any way affected or impaired in any other jurisdiction.

13

CONFIDENTIAL                                            PDC067485

Section 9.10. Survival. All warranties, representations and covenants made by the Company herein or in any other instrument delivered by it or on its behalf under this Agreement shall be considered to have been relied upon by LENDER and shall survive the final payment of any Obligations to LENDER regardless of any investigation made by LENDER or on its behalf. All statements in any such instrument shall constitute representations and warranties by the Company hereunder.

Section 9.11. Survival of Indemnities. All indemnities set forth in this Agreement shall survive the execution and delivery of this Agreement and the final payment of any Obligations to LENDER as well as the full performance of this Agreement.

Section 9.12. Governing Law. This Agreement, the Note and all Loan Documents shall be governed by and in accordance with the laws of the State of Colorado.

Section 9.13. Time of the Essence. Time is of the essence hereof with respect to the dates, terms and conditions of this Agreement and the Loan Documents.

Section 9.14. Attorney's Fees. In the event of a dispute resulting in litigation or arbitration concerning this Agreement, the prevailing party shall be entitled to be reimbursed its reasonable attorneys' fees and costs incurred in connection with such dispute.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day first written above.

**RM FUNDING, LLC**

By:_____

Print:_____

Title:_____

**PDC, LLC**

By: *[signature]*

Print: Tim Flaherty

Title: Manager

14

CONFIDENTIAL                                                                PDC067486

Roberts_05709

Section 9.10. Survival. All warranties, representations and covenants made by the Company herein or in any other instrument delivered by it or on its behalf under this Agreement shall be considered to have been relied upon by LENDER and shall survive the final payment of any Obligations to LENDER regardless of any investigation made by LENDER or on its behalf. All statements in any such instrument shall constitute representations and warranties by the Company hereunder.

Section 9.11. Survival of Indemnities. All indemnities set forth in this Agreement shall survive the execution and delivery of this Agreement and the final payment of any Obligations to LENDER as well as the full performance of this Agreement.

Section 9.12. Governing Law. This Agreement, the Note and all Loan Documents shall be governed by and in accordance with the laws of the State of Colorado.

Section 9.13. Time of the Essence. Time is of the essence hereof with respect to the dates, terms and conditions of this Agreement and the Loan Documents.

Section 9.14. Attorney's Fees. In the event of a dispute resulting in litigation or arbitration concerning this Agreement, the prevailing party shall be entitled to be reimbursed its reasonable attorneys' fees and costs incurred in connection with such dispute.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day first written above.

RM FUNDING, LLC

By: _____

Print: TIM KVEEN

Title: _____

PDC, LLC

By: _____

Print: _____

Title: _____

14

CONFIDENTIAL                                                                PDC067487