**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | |
| MICHAEL JOSEPH ROBERTS, SR., (Debtor) | Bankruptcy Case No. 22-10521-JGR Chapter 7 |
| MICHAEL JOSEPH ROBERTS, SR., | |
| Appellant, | |
| v. | U.S. District Court Case No. 22-CV-2699 REB |
| PDC, LLC; TIMOTHY FLAHERTY; TIMOTHY KNEEN; RIVIERA COUNTRY CLUB, S. DE. R.L. C.V.S., | |
| Appellees. | |

---

**BRIEF OF APPELLEES PDC, LLC, TIMOTHY FLAHERTY, TIMOTHY KNEEN AND RIVIERA COUNTRY CLUB, S. DE. R.L. C.V.S.**

---

120195408.1

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with FED. R. BANKR. P. 8015(a)(7)(B). It contains 10,473 words.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Brent R. Cohen*
Brent R. Cohen, Esq.
Chad S. Caby, Esq.

*Attorneys for PdC, LLC, Timothy Flaherty, Timothy Kneen and Riviera Country Club, S. de R.L. C.V.S.*

i

120195408.1

**TABLE OF CONTENTS**

Page

I.      STATEMENT OF JURISDICTION ......................................................................... 1

II.     STATEMENT OF ISSUES ON APPEAL ............................................................. 1

III.    STATEMENT OF THE CASE ................................................................................ 2

        A.      The Sereno Property Transactions ............................................................ 2

        B.      The Denver District Court Litigation ........................................................ 4

        C.      The Bankruptcy Filing and Post-Petition Events ...................................... 13

        D.      Conversion to Chapter 7 ........................................................................... 19

IV.     SUMMARY OF ARGUMENT ............................................................................... 22

V.      ARGUMENT ......................................................................................................... 25

        A.      The Standard of Review ........................................................................... 25

                1.      The Bankruptcy Court .................................................................... 25

                2.      The Denver District Court ............................................................. 26

        B.      The Bankruptcy Court Acted Within Its Discretion in Finding Bad Faith .. 26

                1.      Bad Faith Filing Is Cause for Conversion ..................................... 27

                2.      The Findings of Bad Faith Are Supported by the Record .............. 29

                3.      The Bankruptcy Court Properly Applied the *In Re Laguna
                        Associates* Factors in Finding Bad Faith ...................................... 31

                4.      The Bankruptcy Court Was Not Required to Consider
                        "Unusual Circumstances" ............................................................. 35

VI.     CONCLUSION ...................................................................................................... 36

120195408.1

# TABLE OF AUTHORITIES

Page

### CASES

*Davis v. Garcia*,
953 F. Supp. 2d 1205 (D. Utah 2013) ........................................................ 26

*Exxon Mobile v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005) .................................................................................... 27

*Frick v. Commissioner*,
T.C. Memo. 1989-86, *aff'd* without published opinion,
916 F.2d 715 (7th Cir. 1990) ....................................................................... 34

*Hall v. Vance*,
887 F.2d 1041 (10th Cir. 1989) ................................................................... 28

*Higgins v. Comm'r*,
312 U.S. 212 (1941) .................................................................................... 34

*In re 15375 Memorial Corp. v. Bepco L.P.*,
589 F.3d 605 (3d Cir. 2009) ........................................................................ 29

*In re Brutsche*,
476 B.R. 298 (Bankr. D.N.M. 2012) ............................................................ 36

*In re Daughtrey*,
896 F.3d 1255 (11th Cir. 2018) ................................................................... 26

*In re Kearney*,
625 B.R. 83 (B.A.P. 10th Cir. 2021) ............................................................ 26

*In re Laguna Associates Ltd. P'ship*,
30 F.3d 734 (6th Cir. 1994) ................................... 22, 31, 32, 33, 34, 35

*In re Melendez Concrete Inc.*,
2009 WL 2997920 (Bankr. N. Mex. Sept. 15, 2009) ................................... 28

*In re Morreale v. 2011-SIP-1 CRE/CADC Venture, LLC*,
533 B.R. 320 (D. Colo. 2015) ...................................................................... 36

*In re Muth*,
2014 WL 1712527 (10th Cir. BAP May 1, 2014) ......................................... 28

*In re Ozcelebi*,
639 B.R. 362 (Bankr. S.D. Tex. 2022) ........................................................ 35

*In re Paige*,
685 F.3d 1160 (10th Cir. 2012) ................................................................... 29

*In re Silberkraus*,
253 B.R. 890 (Bankr. C.D. Cal. 2000) ......................................................... 29

*In re Winslow*,
  949 F.2d 401 (10th Cir. 1991) ................................................................. 28

*Mo's Express, LLC v. Sopkin*,
  441 F.3d 1229 (10th Cir. 2006) .............................................................. 26

*Moothart v. Bell*,
  21 F.3d 1499 (10th Cir. 1994) ................................................................ 26

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
  *(In re Integrated Telecom Express, Inc.)*,
  384 F.3d 108 (10th Cir. 2004) ................................................................ 27

*P.J. ex rel. Jensen v. Wagner*,
  603 F.3d 1182 (10th Cir. 2010) .............................................................. 26

*Skinner v. Switzer*,
  562 U.S. 561 (2011) ............................................................................... 26


**STATUTES AND RULES**

11 U.S.C. § 101 ......................................................................................... 2

11 U.S.C. § 1112 ..................................................................... 1, 28, 29, 35

11 U.S.C. § 1129 ............................................................................... 35, 36

11 U.S.C. § 1184 ..................................................................................... 13

11 U.S.C. § 1191 ............................................................................... 35, 36

11 U.S.C. § 362 ....................................................................................... 15

28 U.S.C. § 151 ......................................................................................... 1

C.R.C.P. 102 .............................................................................................. 9

C.R.C.P. 42.1 ..................................................................................... 13, 31


**OTHER AUTHORITIES**

7 Collier on Bankruptcy ¶ 1112.05[2] (16th ed. rev. 2011) ........................... 36

120195408.1

Appellees PdC, LLC, Timothy Flaherty, Timothy Kneen and Riviera Country Club, S. De. R.L. C.V.S. (collectively, the "PdC Creditors") hereby submit their Brief, and state as follows:

## I.      STATEMENT OF JURISDICTION

a.    The PdC Creditors filed their Motion to Convert Chapter 11 Case to Chapter 7 on May 6, 2022. Jurisdiction was proper in the Bankruptcy Court pursuant to 11 U.S.C. § 1112(b) and 28 U.S.C. § 151.

b.    The Bankruptcy Court's Order Converting Chapter 11 Case to Chapter 7 was entered on September 23, 2022. The Debtor filed his Notice of Appeal of on October 7, 2022. Jurisdiction in the District Court is proper under 28 U.S.C. § 158(a).

## II.     STATEMENT OF ISSUES ON APPEAL

1.    Whether the Bankruptcy Court acted within its discretion in granting the Motion to Convert Case from Chapter 11 to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) based upon a finding of bad faith.

2.    Whether the Bankruptcy Court acted within its discretion in considering prepetition conduct, as documented by the orders of the Denver District Court, in assessing bad faith in the filing of Roberts' Chapter 11 Petition.

3.    Whether the Bankruptcy Court acted within its discretion in finding that the Chapter 11 Petition was filed in bad faith because the filing sought to achieve invalid bankruptcy purposes, including relitigating and invalidating the judgments of the Denver District Court and manipulating the judicial system.

4.     Whether the Bankruptcy Court acted within its discretion in declining to find the existence of unusual circumstances establishing that Roberts could propose a workable Chapter 11 Plan.

### III.    STATEMENT OF THE CASE

Appellant Michael Joseph Roberts, Sr. ("Roberts") sought relief under Chapter 11 of 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") on February 18, 2022 (the "Petition Date"). The filing of the Roberts' Bankruptcy Petition represents the culmination of over four years of litigation in Denver District Court, Case No. 2015CV31828 (the "State Court Litigation") and a last desperate attempt to avoid the consequences of his fraudulent misconduct. The antics of Roberts, and his attorneys, in the State Court Litigation resulted in at least one order of sanctions, a prejudgment writ of attachment, findings of civil contempt, fines and incarceration.

The "Statement of the Case" contained in Roberts' Opening Brief [ECF 14, pp. 3-19] is a fanciful rendition of the circumstances leading up to the filing of Roberts' Bankruptcy Petition and the ultimate conversion of his Chapter 11 case to a Chapter 7 proceeding. It is largely contradicted by the series of orders entered by the Denver District Court and the Bankruptcy Court, along with the appellate record.

### A.     The Sereno Property Transactions

Roberts, Timothy Flaherty ("Flaherty") and Timothy Kneen ("Kneen") were the three managers and members of PdC, LLC ("PdC"), a limited liability company formed under Colorado law to purchase and develop real estate in Mexico near Playa del Carmen. Appl. Apx. 1683-1715, Ex. 44, Denver District Court's Order Regarding April 20 & 22, 2022 Hearing on Damages ("Damages Order"), ¶¶ 1-4, 6. The project was known as Sereno. PdC, through its Mexican subsidiary Riviera Country Club S. de R.L. de C.V.

2

("RCC"), purchased certain real estate for Sereno, known as Sereno II and Sereno III (the "Sereno Parcels"), subject to an outstanding mortgage in favor of a Spanish company ("Hotusa"). *Id.,* ¶¶ 7, 10-11. Eventually, RCC settled with Hotusa, which agreed to accept $6.5 million to release its claims to the Sereno Parcels. *Id.,* ¶¶ 12-15. Under the Settlement Agreement, if RCC failed to make a balloon payment of $5.5 million, Hotusa would receive title to the Sereno Parcels in what amounted to a strict foreclosure. *Id.,* ¶¶ 7, 10-11.

Shortly before the final payment to Hotusa was due, Kneen and Roberts, along with PdC's chief financial officer, Carl Vertuca ("Vertuca"), met on December 13, 2016, in Boulder, Colorado and agreed that Roberts would advance the funds on behalf of PdC to pay Hotusa. *Id.,* ¶¶ 19-20. As the Denver District Court found, however, Roberts had something else in mind.

> [R]oberts, long dissatisfied and frustrated with Kneen and Flaherty's decisions, had been plotting to buy out Hotusa's position and foreclose on the properties since early 2016, when he wrote a note to himself pondering whether he "could skirt RCC and sign away their rights and position by using [his] power of attorney?" Roberts then executed on his scheme by granting Ramirez a power of attorney on behalf of RCC and instructing him to appear in the Mexican courts to sign away RCC's position and allow Roberts to foreclose on Sereno II and Sereno III. Roberts' actions were deliberate and intentional. His plan required him to vest his agents with authority or purported authority to execute the scheme on his behalf.

*Id.,* ¶ 31, citations omitted.

Flaherty and Kneen later learned that, rather than advance the funds on behalf of PdC, Roberts had secretly schemed with his Mexican counsel to forge a power of attorney, falsely representing that he and his attorneys represented RCC under the Settlement Agreement. *Id.,* ¶¶ 16, 23. He then appeared in Mexican Court to ratify the Settlement Agreement and obtain an order that he, Roberts, was the owner of the Sereno

3

Parcels. *Id., ¶¶* 24-25. Roberts lied to the other managers, misappropriated the rights of PdC's subsidiary RCC under the Settlement Agreement and attempted to divert the entire value of the Sereno Parcels to himself at the expense of PdC's lenders, investors and stakeholders. *Id.*, *¶¶* 23-26.

In July 2019, Roberts transferred whatever rights he acquired in the Hotusa lien to a Mexican entity he controlled called Logistics Desarrollos Publicitarios e Inmobiliarios ("Logistics"). *Id., ¶* 53. Roberts subsequently transferred his shares in Logistics to two Mexican nationals. *Id.* As found in the Damages Order, "Put another way, not only did Roberts' actions deprive Cross-Claimants of the ability to sell Sereno II and III—he has now transferred effective legal control over the properties to persons beyond the jurisdiction of this Court." *Id.*

Roberts testified at the evidentiary hearing on the Creditors' Motion to Convert Chapter 11 Case to Chapter 7 ("Conversion Hearing") that unspecified Mexican courts had determined that he is the owner of the Hotusa lien and all rights associated therewith. Appl. Apx. 0716, June 29, 2022 Tr. 99:12-25. According to Roberts, as a result of court decisions rendered in Mexico, which he could not describe, he was the proper owner of the Sereno Parcels. *Id.* However, there was no evidence presented at the Conversion Hearing of what proceedings took place in Mexico or what judgments, if any, had been entered in the Mexican courts.

## B.    The Denver District Court Litigation

Upon learning of Roberts' fraud and breach of fiduciary duty, and after taking steps to stop his efforts in the Mexican litigation [*Id.*, *¶* 28], the PdC Creditors commenced the State Court Litigation by filing their Cross Claim Complaint, Appl. Apx. 0824-0844, Ex. 3. Roberts responded with an Answer to Cross-Claims and Third Party Complaint and

4

Counter Cross Claim Complaint, in which he both consented to and invoked the jurisdiction of the Denver District Court, Appl. Apx. 0854-0875, Ex. 6.

### *Roberts' Violation of the Preliminary Injunction*

The PdC Creditors requested, *inter alia*, a preliminary injunction against Roberts to prevent his further attempts to obtain ownership or control of the Sereno Parcels. The Denver District Court (Hon. Kenneth Plotz), after a full day evidentiary hearing, entered a preliminary injunction against Roberts, finding that the PdC Creditors had established a likelihood of success on the merits:

> The Court finds that the Cross-Claimants have demonstrated a substantial likelihood of success on the merits. The Court also finds that without the issuance of an injunction there is a danger of real, immediate, and irreparable injury that may be prevented by injunctive relief—as Roberts is likely to take assets belonging to PdC through its subsidiary RCC and that if an injunction were not to issue there is [not] a plain, speedy, and adequate remedy at law as the Cross-Claimants and PdC's members may not be able to recover the company's assets.

Appl. Apx. 0845-0853, Ex. 4, Order Granting Motion to Amend and Motion for Preliminary Injunction, dated January 24, 2019 (the "Preliminary Injunction Order"), at p. 4. The Preliminary Injunction Order enjoined Roberts from taking any further action to misappropriate to himself the Sereno Parcels. *Id.* Roberts did not appeal the Preliminary Injunction Order.

As found by the Denver District Court, Roberts repeatedly violated the preliminary injunction by, among other things, assigning his purported rights to Logistics, pursuing appeals and further litigation in Mexico to establish title to the Sereno Parcels in his name and in the name of his new Mexican entity, and even commencing criminal proceedings claiming that PdC's attorneys in Mexico were impairing his ownership rights by asserting that he had acted wrongfully. Appl. Apx. 0876-0880, Ex. 7, Order Re: Contempt Citation

5

issued to Michael J. Roberts, Sr. dated January 6, 2020 (the "Contempt Order"). Upon learning of Roberts' ongoing violations of the Preliminary Injunction Order, the PdC Creditors filed a motion for contempt. The Denver District Court (Hon. Eric M. Johnson), after a second full day evidentiary hearing, found Roberts to be in contempt. *Id.* The Contempt Order required Roberts to pay a fine of $1,000 per day and remain jailed until his contempt was purged. *Id.*

### The Liability Trial

Following the finding of contempt, the Denver District Court conducted a trial on the merits on January 24, 2020, as to Roberts' breach of fiduciary duty. The Court issued its Findings of Fact and Conclusions of Law on June 19, 2020 (the "Findings and Conclusions"), Appl. Apx. 0881-0895, Ex. 8. As noted in the Findings and Conclusions, "Through a Mexican LLC, the parties have placed the governance structure of RCC before this Court." *Id.,* ¶ 19. Making reference to exhibits admitted in that proceeding, the Denver District Court found that they corroborated the testimony of witnesses for the PdC Creditors, including Kneen. *Id.*, ¶ 34. The Denver District Court specifically made findings as to Roberts' credibility, noting that Roberts' prior testimony given before the Court was "false" and that "Roberts was planning to 'skirt RCC' and take the properties for his own benefit." *Id.* ¶ 34. The Denver District Court also found that the PdC Creditors' witnesses, including Kneen and Vertuca, testified credibly. *Id.* ¶ 35.

### Roberts' Misconduct

After entry of the Preliminary Injunction Order and the Findings and Conclusions, the PdC Creditors were granted an *ex parte* attachment to freeze Roberts' assets and an order to have Roberts taken into custody. Appl. Apx. 0896-0899, Ex. 14, Order Granting

Cross Claimants and Third Party Claimants' Motion for an Emergency Ex Parte TRO dated August 28, 2020 (the "Writ of Attachment").

Thereafter, the Denver District Court also entered a sanctions order striking all Roberts' defenses, striking and dismissing his counter or cross claims, precluding him from introducing evidence that he had failed to produce, and entering default in favor of the PdC Creditors on all of their claims for relief.  Appl. Apx. 0900-0904, Ex. 15, Order on Cross-Claimant's Motion for Sanctions dated October 20, 2020.

In August 2021, a third Denver District Court Judge, Hon. Marie Moses, conducted a hearing to determine whether Roberts had purged his contempt by completing the obligations that had been imposed. After another full day evidentiary hearing (the fourth evidentiary hearing in the case—the previous hearings were the preliminary injunction hearing, the trial, and the traverse hearing), Judge Moses remanded Roberts on August 6, 2021, to be incarcerated until he complied with the outstanding orders of the Denver District Court and remedied the misappropriation of the Sereno Parcels. Appl. Apx. 0932-0946, Ex. 23, Order Re: August 6, 2021 Hearing on Contempt dated August 8, 2021 (the "Purge Order"). The findings made in the Purge Order are instructive.

- Roberts' testimony was not credible in many respects. *Id.*, ¶ 12.

- Roberts' testimony that he did not know the meaning of pleadings he had signed for filing in the Mexican court was "without any credibility whatsoever." *Id.*, ¶ 15.

- Roberts "deliberately sabotaged the notarization of the revocation of the power of attorney . . . contrary to the preliminary injunction and Contempt Order." *Id.,* ¶ 16.

- Roberts drafted a withdrawal of his claims in a Mexican court, supposedly in compliance with the Preliminary Injunction Order "in a manner that he knew it would be thrown out by the Mexican court and that it would not have any binding authority." *Id.,* ¶ 17.

- "The Court finds that all of the actions that Roberts has purportedly taken to comply with the preliminary injunction and the Contempt Order have been merely theatrics designed to make it appear that Roberts is complying with court orders." *Id.,* ¶ 19.

- "Roberts has requested a stay of the jail sentence that has been imposed to give him additional time to comply with the purge clauses of the Contempt Order. However, Roberts had done nothing to explain why he needs additional time to purge the contempt. Roberts has had nineteen (19) months to comply with the Contempt Order dated January 6, 2020, but he has refused to do so and continues to act in defiance of those orders." *Id.*, ¶ 21.

On July 23, 2021, a hearing was held before Judge Moses on two traverses of the Writ of Attachment issued by the Denver District Court on August 28, 2020. Judge Moses entered her order on October 6, 2021. Appl. Apx. 0947-0969, Ex. 24, Order Re: July 23, 2021 Hearing on Traverses of August 20, 2020 Writ of Attachment, October 6, 2021. Judge Moses recited the history of the litigation, beginning with the filing of the PdC Creditors' cross claims and their request for an *ex parte* writ of attachment. She noted that, at the time the Writ of Attachment was issued, an arrest warrant had been outstanding for Roberts and that he had been found in contempt. While the contempt order was outstanding, with a directive that Roberts appear in court or otherwise

8

surrender, Roberts fled to Mexico for approximately six months. *Id.*, p. 6. "Roberts did not inform the Court that he had returned to Colorado in March 2021, nor did he surrender himself or his passport upon his return." *Id.* The Court made the following findings in support of her conclusion that there were sufficient grounds for issuance of the Writ of Attachment:

- "Roberts concealed himself and stood in defiance of an officer so that process of law could not be served upon him." *Id.,* p. 13.

- "Roberts fraudulently transferred, assigned, or conveyed the rights he acquired from Hotusa from the State of Colorado with the intent to defraud, delay, or hinder his creditors, or to render process or execution unavailing if judgment is obtained." *Id.,* p. 16.

- "Roberts fraudulently concealed his assets with an intent to hinder or delay his creditors, or render collection unavailing if judgment is obtained." *Id.,* p. 18.

- "Roberts was about to depart to Mexico, with the intention of having his property or effects, or a material part thereof, removed from the state. C.R.C.P. 102(c)(9)." *Id.,* p. 20.

On the basis of the foregoing, Judge Moses denied Roberts' traverse and sustained the Writ of Attachment.

On January 24, 2022, Judge Moses entered her Order Partially Granting Michael Roberts' Request to Approve Distribution of Proceeds, authorizing the distribution of a portion of the proceeds of the sale of Roberts' Beaver Creek condominium. Appl. Apx. 2062-2064, Ex. VVVV. This included $141,500 disbursed to the Mexican law firm of Bufete Olea y Asociados, S.C. Roberts testified at the Conversion Hearing that the funds

had been paid to the firm, who had done everything they could to purge his contempt. Appl. Apx. 0798-0799, June 29, 2022 Tr. 182:21-183:14. However, during cross examination at the Conversion Hearing, Roberts admitted that he had not reviewed any billing invoices from the Mexican law firm and could not offer any information as to what specifically had been done in this regard. Appl. Apx. 0803, Tr. 186:11-24.

Beyond the funds paid to Bufete Olea y Asociados, S.C., there is no evidence that Roberts took any specific action to purge his contempt between the Petition Date and the Conversion Hearing.

### The Damages Hearing

After the PdC Creditors obtained an order granting relief from stay [Appl. Apx. 0222, ECF No. 92], the damages phase of the case was tried in the Denver District Court on April 20 and 22, 2022 (the "Damages Hearing"). On June 23, 2022, Judge Moses entered the Damages Order. Appl. Apx. 1683-1715, Ex. 44. The Damages Order contains detailed findings regarding the parties' conduct with respect to the Sereno Parcels, including the meeting attended by Roberts, Kneen and Vertuca on December 13, 2016, at which the parties agreed to settle with Hotusa and pay off its lien against Sereno II and Sereno III. In this regard, Judge Moses made the following finding:

> Indeed, Roberts lied to Kneen and Vertuca, telling them he would pay Hotusa on behalf of PdC, when, in fact, he planned to do the opposite. Had Roberts not lied to and misled Cross-Claimants, they would have been able [to] pay Hotusa themselves and Roberts would not have been able to foreclose on the properties. Roberts conceived of a plan whereby he would secretly pay $5,500,000 to acquire personal ownership of real property worth $12,200,000 which belonged to an entity to which he owed a duty of loyalty.

*Id.*, ¶ 23.

Judge Moses awarded damages, in part, for "funds [Cross-Claimants] were required to spend as a result of Roberts' misconduct to maintain the properties and to resist Roberts' foreclosure actions . . ." *Id.,* ¶ 75(d). Finding that "Roberts' continued pursuit of legal actions in Mexico in violation of his fiduciary duties has likewise damaged Cross-Claimants," Judge Moses awarded $597,961 in damages to Cross-Claimants for having to defend the actions and by Roberts' receipt of damages in the Mexican litigation. [*Id.,* ¶ 75(e)]

Judge Moses awarded $5,500,000 in exemplary damages, finding that "Roberts' conduct was both willful and wanton and attended by circumstances of fraud." *Id.*, ¶ 75(f). In addition, she found that, even after the lawsuit was filed, Roberts had:

> [C]onsistently throughout this litigation undertaken intentional conduct that has served to aggravate Cross-Claimants' injury—namely Roberts continued to breach his fiduciary duties and to violate this Court's preliminary injunction, by pursuing legal actions in Mexico based on his claims of ownership to Sereno II and Sereno III. After a contempt citation had been issued, Roberts transferred his wrongfully obtained rights to a shell company in Mexico and after being held in contempt he transferred his ownership in that shell company to two Mexican nationals—a fact he concealed from the Court and Cross-Claimants for almost two years and which has had the effect of making it impossible for Roberts to return the wrongfully obtained interests to Cross-Claimants and clear title to the properties. After this occurred, Roberts further lied to Cross-Claimants by executing documents that purportedly would have had the effect of clearing title to Sereno II and Sereno III, but at the time he did so he knew he no longer had any authority to act on behalf of Logistics or ability to convey the right to Sereno II and Sereno III.

In determining damages associated with Roberts' conduct in relation to the Sereno Parcels, Judge Moses calculated a loss of $12,200,000, but credited $5,500,000 for the "Hotusa lien that was required to have been paid off." *Id.*, ¶ 75(b). As reflected in paragraph 77 of the Damages Order, Judge Moses awarded a total of $10,456,162.00 in

actual damages, $5,500,000.00 in exemplary damages and $5,168,834.37 in prejudgment interest on actual damages. She also awarded attorneys' fees and costs. Judge Moses expressly rejected Roberts' argument that the Creditors were not entitled to damages because PdC was arguably insolvent, as noted in paragraph 76 of the Damages Order. *Id.*

> Roberts' assertion that there were no damages because PdC and RCC had debt that exceeded the value of the property is rejected for the reasons asserted in Cross- Claimants' briefs on their entitlement to damages. To the extent that PdC and RCC had unsecured debts, creditor claims, preferred debt or other forms of capital invested, they were entitled to utilize the value of the property to pay or compromise those debts to the extent practical. Roberts' actions which reduced or eliminated the equity in the assets owned by RCC and PdC damaged RCC and PdC, rendering an award of damages appropriate.

The issuance of the Damages Order did not conclude the State Court Litigation. The Preliminary Injunction Order [Appl. Apx. 0845-0853, Ex. 4], Attachment Order [Appl. Apx. 0896-0899, Ex. 14], Sanctions Order [Appl. Apx. 0900-0904, Ex. 15], Contempt Order [Appl. Apx. 0876-0880, Ex. 7] and Purge Order [Appl. Apx. 0932-0946, Ex. 23] have not been modified by the Denver District Court and currently remain in full force and effect.

### The Ciro Lawsuit

Roberts testified at the Conversion Hearing that he owned 100 percent of Ciro Properties. Appl. Apx. 0743-0744, June 29, 2022 Tr. 126:23-127:2. On March 1, 2021, Ciro Properties, "derivatively on behalf of RM Funding, LLC" filed a complaint in Arapahoe County District Court naming the PdC Creditors as defendants, along with RM Funding, LLC (the "Ciro Lawsuit"). Appl. Apx. 1396-1411, Ex. 36, Notice of Removal and Exhibits. As reflected in the complaint, Ciro Properties was represented by Podoll & Podoll, P.C., the same firm representing Roberts in the State Court Litigation and in this appeal.

Asserting claims based on "Breach of Promissory Notes" and "Breach of Fiduciary Duty," Ciro Properties sought a judgment in the amount of approximately $10 million.

After the PdC Creditors moved for a transfer of venue of the Ciro Lawsuit to Denver District Court, the matter was referred to the Panel on Consolidated Multidistrict Litigation under C.R.C.P. 42.1(c)(1) "to determine whether the Denver District Court case 15CV31828 and Arapahoe County District Court case 21CV30401 should be consolidated and assigned to one judicial officer in the same district." Appl. Apx. 1412-1501, Ex. 37, Defendants' Motion for Abstention and Remand. Subsequently, the Panel on Consolidated Multidistrict Litigation certified the Ciro Lawsuit for consolidation in Denver County on September 8, 2021. *Id.* Chief Justice Brian D. Boatright assigned Judge Moses to hear the consolidated actions. Roberts' failed attempt to remove the Ciro Lawsuit to the Bankruptcy Court, as described below, represents, in part, post-petition misconduct on which the Conversion Order is based. *Id.*

## C.    The Bankruptcy Filing and Post-Petition Events

On the Petition Date, Roberts filed his Chapter 11 bankruptcy case (the "Bankruptcy Case"). On the same date, pursuant to 11 U.S.C. § 1182(1), Roberts elected to proceed under Subchapter V of Chapter 11. *See* Appl. Apx. 0001-0013, ECF No. 1. Following the Petition Date, Roberts remained in possession of his assets and operated and managed his affairs as a Debtor-in-Possession pursuant to the provisions of 11 U.S.C. § 1184.

The effect of his bankruptcy filing, on the Friday before the Damages Hearing, was to (a) stop the Damages Hearing; and (b) force the Denver District Court to release Roberts from incarceration for remedial contempt. The Damages Hearing scheduled for February 22, 2022, was the third scheduled date for determination of damages resulting

from Roberts' breaches of his duties. The Bankruptcy Petition was filed only after Roberts moved to continue the third scheduled damages hearing trial on the Friday before it was to commence. *See* Order Regarding Unopposed Motion to Continue Hearing of February 22 and 23, 2022, Appl. Apx. 2123-2124, Ex. ZZZZ. Nevertheless, the Denver District Court noted that arrangements had been made for Roberts to attend the hearing by Webex from jail. *Id.*

### The Stay Relief Motions

Shortly after the Petition Date, the PdC Creditors filed their Motion for Relief from Automatic Stay (the "Initial Stay Motion") for purposes of rescheduling the Damages Hearing. Appl. Apx. 0014-0161, ECF No. 26. Roberts objected to the Motion, attempting to avoid further proceedings in the Denver District Court and telegraphing his intent to somehow transfer the litigation to the Bankruptcy Court. Appl. Apx. 0162-0221, ECF No. 74. In paragraph 74 of the Objection, Roberts argued that the Denver District Court "should not be permitted to determine whether the Debtor is actually liable for the damages that it may "liquidate"—such liability should be reserved for this Court." Roberts also argued that the Denver District Court "lacks subject matter jurisdiction" over the State Court Litigation, in spite of the fact that he had previously confessed jurisdiction in Denver District Court. *Id.,* ¶ 50. On March 25, 2022, after a preliminary hearing, the Court issued an oral ruling granting stay relief and subsequently entered its Order Granting Motion for Relief from Stay and Judgment. Appl. Apx. 0222 and 0223,( ECF Nos. 92 and 93) (the "Stay Order").

The Stay Order granted the PdC Creditors relief from stay to reset the Damages Hearing and liquidate their claims against Roberts in Denver District Court. Separately, the Bankruptcy Court deferred ruling on whether the automatic stay applied to certain

14

contempt proceedings occurring prepetition in the Denver District Court, namely whether 11 U.S.C. § 362(b)(4) (the police and regulatory exception to the automatic stay) applied to the Denver District Court's civil contempt enforcement orders.

In light of the Stay Order, on April 12, 2022, the PdC Creditors filed their Motion for Relief from the Automatic Stay, or Alternatively, To Confirm the Automatic Stay Does Not Apply Pursuant to 11 U.S.C. § 362(b)(4) Appl. Apx. 0224-0336 [ECF No. 104] (the "Second Stay Motion"). On May 12, 2022, after a preliminary hearing, the Bankruptcy Court issued an oral ruling granting stay relief and subsequently entered its Order Confirming that the Automatic Stay Does Not Apply Pursuant to 11 U.S.C. § 362(b)(4) Appl. Apx. 0428, 0429, and 0430, (ECF Nos. 157, 158, and 161).

### *The Adversary Proceedings*

In addition to his attempt to avoid the resetting of the Damages Hearing in the context of the Initial Stay Motion, Roberts initiated three adversary proceedings after the filing of his Bankruptcy Petition, all intended to either disrupt the State Court Litigation or relitigate matters already decided by the Denver District Court. As the Bankruptcy Court found in the Conversion Order, the filing of these proceedings was illustrative of Roberts' bad faith.

(a)    *Roberts v. RCC, et al.*, Adv. Pro. 22-1052. Appl. Apx. 0970-1133, [Ex. 33] According to the Plan [Appl. Apx. 1502-1676, Ex. 38, pp. 11-12], the purpose of this lawsuit is to obtain "recognition by the Court of the final result of the litigation in Mexico that recognized Debtor's real and personal property rights, as it pertains to at least two of the four parcels held by RCC and corporate disputes between the parties on issues related thereto." As noted by the Bankruptcy Court in the Conversion Order, "in the view of this

15

Court, [this case] seeks to relitigate issues already decided by the Denver District Court, namely by seeking recognition of the result of the Mexico litigation." Appl. Apx. 0474-0486, ECF No. 294, Conversion Order, p. 5. The PdC Creditors moved to dismiss Adv. Pro. 22-1052. [Appl. Apx. 1134-1310, Ex. 34]. On November 29, 2022, the Bankruptcy Court entered an Order Granting Defendants' Motion to Dismiss. Appl. Apx. 0563, ECF No. 25.

(b)     *Ciro Properties, LLC v. PdC, LLC, et al.*, Adv. Pro. 22-1137. Appl. Apx. 1396-1411, Ex. 36. Roberts filed a Notice of Removal with respect to an action originally filed in state district court for Arapahoe County, Colorado on March 1, 2021 and eventually consolidated with the State Court Litigation. Roberts is not a party to that lawsuit. The Bankruptcy Court noted that this case "is an attempted removal by Roberts of a state district court civil action to which he is not a party." Appl. Apx. 0474-0486, Conversion Order, p. 5. The PdC Creditors moved for remand and abstention. Appl. Apx. 1412-1501, Ex. 37. On November 29, 2022, the Bankruptcy Court entered an Order Granting Defendants' Motion for Abstention and Remand, [Appl. Apx. 0564-0565], remanding the proceeding back to state court.

(c)     *Roberts v. Almazan, et al.*, Adv. Pro. 22-1133. [Appl. Apx. 1311-1395, Ex. 35] This is an avoidance action filed on April 13, 2022 against the two Mexican nationals to whom Roberts' equity interest in Logistics was transferred. The Bankruptcy Court noted in the Conversion Order that, "[a]s of the date of this writing, this Adversary Proceeding has been pending for over five months, yet Roberts has not served the defendants with process."

16

***Creditor Claims***

The deadline for filing proofs of claim by non-governmental creditors was April 29, 2022. Copies of proofs of claim filed in this matter were admitted as Exhibits Y through RR, inclusive. Appl. Apx. 2065-2090; 2091-2122; 1716-1935; 1972-2061. The claims register, as of June 1, 2022, was admitted as Exhibit 40. Appl. Apx. 1677-1682. The claims fall into four categories:

(a)   Claims secured by Roberts' primary residence located in Boulder, Colorado and valued on his Schedule A at $5,278,200 [Appl. Apx. 1936-1971, Exhibit P]:

| | | | |
|---|---|---|---|
| (i) | Wells Fargo Bank | $283,289.48 | [Ex. Y] |
| (ii) | Wells Fargo Bank | 414,080.70 | [Ex. Z] |
| | **Total** | **$697,370.18** | |

(b)   Consumer and tax debt:

| | | | |
|---|---|---|---|
| (i) | Chase Bank USA | $1,129.12 | [Ex. AA] |
| (ii) | Chase Bank USA | 43,644.59 | [Ex. BB] |
| (iii) | IRS | 2,390.89 | [Ex. CC] |
| (iv) | American Express | 36,351.09 | [Ex. DD] |
| (v) | Jefferson Cap. Sys. | 242.32 | [Ex. EE] |
| (vi) | American Express | 4,294.00 | [Ex. GG] |
| | **Total** | **$88,052.01** | |

(c)   Attorneys' and mediation fees:

| | | | |
|---|---|---|---|
| (i) | Connolly Law | $125,000.00 | [Ex. FF] |
| (ii) | Foster Graham | 136,607.88 | [Ex. HH] |
| (iii) | Edward Nottingham | 981.22 | [Ex. II] |
| (iv) | Podoll & Podoll | 1,318,442.12 | [Ex. KK] |
| | **Total** | **$1,581,031.22** | |

(d)   Sereno damages claims:

| | | | |
|---|---|---|---|
| (i) | Richard Lang | $ 1,498,469.28 | [Ex. JJ] |
| (ii) | PdC Creditors | 21,124,986.37 | [Ex. KK-RR][1] |

---

[1] Exhibits KK through RR, inclusive, were proofs of claim filed by the PdC Creditors and affiliates prior to entry of the Damages Order. Counsel has represented that they will be amended to conform to the Damages Order. The damages award includes attorneys' fees incurred by the PdC Creditors, which have not yet been awarded.

17

**Total**                                 **$22,623,455.65**

Based on the above figures, total claims, as currently filed, equal $24,292,538.88.

Of this amount, the only claims not related to the State Court Litigation are the consumer

and tax claims, totaling $88,052.01, which is approximately 0.36% of the total.

### *Roberts' Chapter 11 Plan*

Roberts filed his Debtor's Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code ("Plan") on May 19, 2022, Appl. Apx. 1502-1676, Ex. 38. The Plan

contains the following language at pp. 9-10, which directly contradicts the findings of the

Denver District Court in the Preliminary Injunction Order [Appl. Apx. 0845-0853, Ex. 4],

the Contempt Order [Appl. Apx. 0876-0880, Ex. 7], the Purge Order [Appl. Apx. 0932-

0946, Ex. 23] and the Damages Order [Appl. Apx. 1683-1715, Ex. 44]:

> In December 2016, RCC and the investors in PdC and a sister company
> named PdC II, LLC, were due to make a $5,500,000.00 payment to the
> lienholder on at least two of RCC's four parcels. Unfortunately, none of the
> investors, including its principals, nor RCC were in a financial position to
> fund the $5,500,000.00 payment. As the deadline approached, and only
> several days before RCC would have lost the property to the lienholder, the
> Debtor proposed to make the $5,500,000.00 payment in his personal
> capacity and/or through one of his entities but not on behalf of RCC. The
> Debtor informed RCC, and its managers, that he planned to then develop
> the property in order to generate profits to repay RCC's investors. The
> proposed plan met with minor resistance limited to other investors
> attempting to capitalize upon the Debtor making the $5,500,000.00
> payment, without any requisite contribution on their behalf, and no
> agreement was reached on these attempts to exploit the Debtor's payment.
> As no party objected to the Debtor making the $5,500,000.00 payment in
> his individual capacity and/or through one of his entities, the Debtor made
> the accepted payment to the lienholder and acquired the lienholder's rights.
> As a result of his payment, the Debtor acquired the lienholder's interest in
> the two parcels. As required by Mexican law, the Debtor transferred the
> interest to a newly formed Mexican entity. The Debtor's right, title and
> interest in and to the subject real property and the liens encumbering it have
> been thoroughly litigated to resolution in Mexico both at the state and
> federal court levels.

In the Plan, Roberts characterizes the State Court Litigation as an attempt to "collaterally attack the Mexican court dispositive rulings adjudicating the Debtor's property rights." Appl. Apx. 1683-1715, Ex. 38, p. 10. No evidence was admitted at the Conversion Hearing with respect to the contents of the Mexican court rulings or how they might impact Roberts' rights.

The Plan proposes periodic payments on general unsecured claims over a five-year period, during which total payments to creditors are estimated at $1,932,609.14. *See* Appl. Apx. 1550-1562, Ex. 38, Plan Composite Exhibit B. It further provides at Section V(C)(1), p. 14, that, "At the end of the five (5) year period, the Debtor shall pay any remaining outstanding amounts due to the Holders of Allowed General Unsecured Claims via a balloon payment, which shall be funded from property of the estate and by the liquidation of any property owned by the Reorganized Debtor as may be necessary to pay Allowed Claims in full." In round figures, total unsecured claims filed thus far in the Bankruptcy Case aggregate over $24 million, without inclusion of attorneys' fees that will eventually be awarded to the PdC Creditors. Thus, the "balloon payment" referred to in the Plan would have to be in excess of $22 million.

## D.    Conversion to Chapter 7

On April 22, 2022, the Court entered its *sua sponte* Order Setting Telephonic Preliminary Hearing [Appl. Apx. 0337-0338, ECF No. 123], questioning "whether [Roberts'] case should be dismissed under 11 U.S.C. § 1112(b) as a bad faith filing." On May 3, 2022, the Court entered its Order and Notice Vacating Telephonic Preliminary Hearing and Objection Deadline for Bad Faith Dismissal [Appl. Apx. 0339, ECF No. 141], setting a status and scheduling conference "on the issue of bad faith dismissal." The PdC Creditors filed their Motion to Convert Chapter 11 Case to Chapter 7 ("Motion to Convert")

19

on May 6, 2022. Appl. Apx. 0340-0427, ECF No. 149] Roberts filed his Debtor's Objection and Response in Opposition to Motion to Convert Chapter 11 Case to Chapter 7 on May 20, 2022. [Appl. Apx. 0431-0473, ECF No. 175.

On June 29-30, 2022, the Court held the Conversion Hearing, during which Roberts testified at length. He repeatedly stated that he filed his Chapter 11 proceeding with certain objectives in mind. These objectives included (1) protection of his assets, (2) enforcement of judgments entered by courts in Mexico, (3) consolidation of legal actions in one forum and (4) eventual participation in a joint venture that would involve the development of the Mexican properties. Appl. Apx. 0723-0725, June 29, 2022 Tr. 106:4-108:2. Roberts further testified at the Conversion Hearing that he was released from incarceration shortly after the Petition Date. Roberts did not identify any action he had taken to purge his contempt with the Denver District Court. Appl. Apx. 0800-0803, Tr. 183:7-186:24.

In response, the PdC Creditors noted:

(a)      Any threat to Roberts' assets is a direct result of his own misconduct. Based on findings made by the Denver District Court in the Attachment Order [Appl. Apx. 0896-0899, Ex. 14] and Traverse Order [Appl. Apx. 0947-0969, Ex. 24], the fraudulent transfer of the Hotusa lien rights to Logistics and the subsequent transfer of the equity interest in Logistics to two Mexican nationals, demonstrated the need for a Chapter 7 trustee to be in control of Roberts' assets.

(b)      Enforcement of unspecified Mexican judgments outside of the State Court Litigation is not a legitimate bankruptcy purpose. The Denver District Court had previously ruled that the Mexican judgments do not alter the outcome

20

of its decisions [Appl. Apx. 0905-0914 and 0915-093, Exs. 20 and 21] and that pursuit of the Mexican judgments was in itself a breach of Roberts' fiduciary duties to Flaherty and Kneen. Appl. Apx. 1683-1715, Ex. 44, Damages Order, ¶ 75(f). The Denver District Court found that Roberts' activity in the Mexican courts was part of his fraudulent scheme. *Id.*

(c)    Roberts' attempted consolidation of litigation in the Bankruptcy Court is a further indication of bad faith. Prior to the filing of the bankruptcy petition, all litigation was consolidated in the Denver District Court. Roberts and his attorneys made a number of efforts to fragment that litigation by filing the Ciro Lawsuit in Arapahoe County, which was eventually consolidated with the State Court Litigation. The Denver District Court had fairly and efficiently presided over these matters since their inception.

(d)    While Roberts repeatedly expressed his desire to develop the Sereno Parcels, doing so is out of his control. He acknowledged that he is a minority investor in PdC. As Judge Moses found, his problems emanate from a desire to control the Sereno Parcels  at the expense of his co-investors, who own the majority interest in PdC. *Id.*, ¶¶ 29, 51 and 54. At present, the Preliminary Injunction Order limits his involvement with the Sereno Parcels to conveying them back to RCC, which he has not done. Whatever rights Roberts has were conveyed to Logistics, which is now owned by two Mexican nationals.

On September 23, 2022, the Bankruptcy Court entered its Order Converting Chapter 11 Case to Chapter 7 ("Conversion Order"). Appl. Apx. 0474-0486, ECF. No. 294. Importantly, after hearing extensive testimony from Roberts, the Bankruptcy Court

21

found that he was "regularly evasive and non-responsive on cross-examination. The Court agrees with the assessment of Roberts' lack of credibility made previously by three Denver District Court judges." *Id.* at 6. The Bankruptcy Court concluded that "Roberts has engaged in a level of pre-petition litigation misconduct not previously seen by this Court." *Id.* at 12.

> He never presented an excuse for noncompliance with court orders—or any efforts to show compliance—and exhibited utter disregard for valid orders of the Denver District Court. His bankruptcy filing attempts to alter not only the outcome of his financial affairs, but a bankruptcy outcome under which he never intends to purge his contempt of the Denver District Court. He seeks to wave a "magic wand" to sanitize his transgressions and remain in control of his assets as a fiduciary to his creditors for five more years. This case demands the swift appointment of a neutral third party in the form of a Chapter 7 trustee.

*Id.* at 12.

The Court ultimately held that the factors enumerated in *In re Laguna Associates Ltd. Partn.*, 30 F.3d 734, 738 (6th Cir. 1994), overwhelmingly weighed towards a finding of bad faith, and thus, conversion was appropriate. *See Id.* at 9.

In sum, the record abundantly supports Roberts' prepetition and post-petition misconduct that ultimately led to the Bankruptcy Court's conclusion that conversion to a Chapter 7 proceeding was necessary and appropriate.

## IV.    SUMMARY OF ARGUMENT

The bulk of Roberts' Opening Brief is dedicated to a prolonged lamentation of the purportedly shoddy treatment he has received at the hands of the Denver District Court. According to Roberts, the findings and rulings of the Denver District Court can only be attributed to "a false and malicious four-year campaign in the Denver Court to harass the Debtor and deprive him of his constitutional rights." Opening Brief, p. 19. Rather, according to Roberts, the rulings of the Denver District Court should be disregarded in

favor of more hospitable rulings he has received in the Mexican courts, evidence of which was never presented. Certain salient facts are overlooked in Roberts' discussion:

- Roberts confessed to and invoked the jurisdiction of the Denver District Court in his Answer to Cross-Claims and Third Party Complaint and Counter Cross Claim Complaint. Appl. Apx. 0854-0875, Ex. 6.

- Roberts elected not to appeal the Preliminary Injunction Order, even though he had the opportunity to do so.

- The Denver District Court considered and rejected Roberts' jurisdictional challenges in the context of motions seeking reconsideration of its previous orders. Appl. Apx. 0905-0914 and 0915-0931, Exs. 20 and 21.

Similarly, Roberts' actions and misconduct giving rise to the Preliminary Injunction Order, Sanctions Order, Contempt Order, Purge Order, and, ultimately, the Damages Order, are well-documented in the record.

- "Roberts lied to Kneen and Vertuca, telling them he would pay Hotusa on behalf of PdC, when, in fact, he planned to do the opposite." Appl. Apx. 1683-1715; Damages Order, ¶ 23.

- After the Contempt Order had been issued, Roberts transferred his interest in the Sereno Parcels to Logistics and then transferred ownership of Logistics to two Mexican nationals, "a fact he concealed from the Court and [the PdC Creditors] for almost two years . . ." *Id.*, ¶ 75(f).

- "Roberts further lied to [the PdC Creditors] by executing documents that purportedly would have had the effect of clearing title to [the Sereno

Parcels], but at the time he did so he knew he no longer had authority to act on behalf of Logistics . . ." *Id.*

- Roberts' testimony at prior hearings was "false." Appl. Apx. 0881-0895; Findings and Conclusions, ¶ 34.

- "Roberts' testimony was not credible in many respects" and, in certain respects, "without any credibility whatsoever." Appl. Apx. 0932-0946, Purge Order, ¶ 15.

- "Roberts has had nineteen (19) months to comply with the Contempt Order dated January 6, 2020, but he has refused to do so and continues to act in defiance of those orders." Appl. Apx. 0932-0946; Purge Order, ¶ 21.

- "Roberts' conduct was both willful and wanton and attended by circumstances of fraud." Appl. Apx. 1683-1715; Damages Order, ¶ 75(f).

- "Roberts also acted fraudulently." *Id.*

After seeking protection under the Bankruptcy Code, Roberts' deceitful and manipulative conduct did not cease. The Bankruptcy Court concluded that Roberts filed for Chapter 11 in bad faith to "re-litigate and invalidate the judgments of the Denver District Court" and "manipulate the judicial system." Appl. Apx. 0474-0486; Conversion Order, p. 9. Having been released from incarceration shortly after the Petition Date, Roberts made no effort to comply with the orders of the Denver District Court and purge his contempt over the seven months that his Chapter 11 case remained pending. Finally, like the three judges of the Denver District Court, the Bankruptcy Court observed that Roberts' testimony was "evasive and non-responsive," agreeing "with the assessment of Roberts' lack of credibility . . ." *Id.*, p. 6.

The filing of Roberts' Bankruptcy Petition was nothing more than a continuation of what is now a well-documented effort to cheat his fellow investors and exploit the court system to achieve his corrupt objectives. On the basis of this misconduct, the Denver District Court has now awarded damages in excess of $22 million, including $5.5 million in punitive damages. The orders of the Denver District Court are binding under the *Rooker-Feldman* doctrine. Similarly, the factual findings of the Bankruptcy Court are entitled to deference, absent a showing of abuse of discretion. This appeal is nothing more than the latest attempt by Roberts to avoid the consequences of his own misconduct, in and out of court.

## V.    ARGUMENT

### A.    The Standard of Review

#### 1.    The Bankruptcy Court

Courts considering conversion from Chapter 11 to Chapter 7 review a bankruptcy court's decision for abuse of discretion. *In re Kearney*, 625 B.R. 83, 93 n.72 (B.A.P. 10th Cir. 2021) (citing *In re Daughtrey*, 896 F.3d 1255, 1273 (11th Cir. 2018)). In conducting a review for an abuse of discretion, reviewing courts "must affirm" unless the trial court has made a clear error of judgment, or applied the wrong legal standard. *In re Daughtrey*, 896 F.3d at 1274 (quoting *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008)). Deference is given to the Bankruptcy Court "because of its first-hand ability to view the witness or evidence and assess credibility and probative value." *Kearney*, 625 B.R. at 93 (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)). In this case, after observing Roberts' testimony, the Bankruptcy Court concluded that he lacked credibility as a witness.

120195408.1

### 2.   The Denver District Court

Roberts' lengthy (and inaccurate) description of the State Court Litigation underscores a fundamental aspect of his bad faith. Under the *Rooker-Feldman* doctrine, neither the Bankruptcy Court nor this Court is authorized to review the rulings of the Denver District Court. The *Rooker-Feldman* doctrine is jurisdictional. Federal courts lack subject matter jurisdiction over claims falling within its ambit. *P.J. ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010); *Davis v. Garcia*, 953 F. Supp. 2d 1205, 1214 (D. Utah 2013) (*citing Skinner v. Switzer*, 562 U.S. 561 (2011)). *Rooker-Feldman* applies where the plaintiff is attempting to "reverse" or "undo" a state court judgment. *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006).

Here, Roberts attempted to exploit the automatic stay and initiated three adversary proceedings in the Bankruptcy Court for purposes of thwarting or overturning the rulings of the Denver District Court. His efforts fell squarely within the *Rooker-Feldman* doctrine— a case "brought by state-court losers . . . inviting district court review and rejection of the [state court's] judgments." *Skinner*, 562 U.S. at 532 (quoting *Exxon Mobile v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). Roberts is a state court loser, undoubtedly displeased with the Preliminary Injunction Order, the Findings and Conclusions, the Sanctions Order, the Contempt Order, the Purge Order, the Order on Traverses and the Damages Order. He seeks a different outcome on the basis of rulings purportedly entered by Mexican courts, of which there is no evidence, that predated and were in fact litigated in the State Court Action.

### B.   The Bankruptcy Court Acted Within Its Discretion in Finding Bad Faith

The crux of Roberts' argument is that the Bankruptcy Court's findings as to his bad-faith filing must be disregarded as long as, in retrospect, some legitimate purpose

120195408.1

can be articulated. No such legitimate purpose exists. Roberts acknowledges that the determination of good faith "is a fact intensive inquiry requiring an examination of the totality of the facts and circumstances." Opening Brief at p. 24, *citing NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (10th Cir. 2004). In this regard, the Bankruptcy Court, over the course of two days of evidence and argument, considered "the totality of the facts and circumstances" and reached the conclusion that Roberts filed for Chapter 11 in bad faith. The Bankruptcy Court's findings of fact are amply supported by the record. Roberts does not suggest, nor could he suggest, that those factual findings represent an abuse of discretion.

### 1.    Bad Faith Filing Is Cause for Conversion

Standing alone, the Bankruptcy Court's finding that Roberts' Bankruptcy Petition was filed in bad faith is sufficient to sustain the Conversion Order. Section 1112(b) of the Bankruptcy Code governs the conversion of Chapter 11 cases to Chapter 7 and provides, in relevant part:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

Section 1112(b)(4) provides a non-exhaustive list of sixteen factors from which the Court may find a showing of "cause" for purposes of Section 1112(b)(1). *See Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (stating list of enumerated grounds is not exclusive); *In re Muth*, 2014 WL 1712527, at *8 n.29 (10th Cir. BAP May 1, 2014) ("[Section 1112(b)(4)] sets forth non-exclusive grounds for cause.").

27

Although bad faith is not specifically included in the list found in Section 1112(b)(4), it nevertheless is grounds for conversion. *See In re Winslow*, 949 F.2d 401, *2 (10th Cir. 1991) (unpublished disposition). "In determining whether a debtor has acted in bad faith, courts, in general, consider any factors which indicate that a petition was filed to abuse the purposes of the Bankruptcy Code, or to delay or frustrate the legitimate efforts of creditors to enforce their rights." *Id.* In *Winslow*, one factor that justified conversion based on bad faith was the debtor's attempt to avoid state court judgments. *Id.*

The factors indicating a petition was filed in bad faith can be gleaned from the events leading up to the filing of Roberts' Bankruptcy Petition. *See In re Melendez Concrete Inc.*, 2009 WL 2997920 (Bankr. N. Mex. Sept. 15, 2009) ("Debtor contends that its prepetition conduct is irrelevant to a motion to dismiss or convert. This contention is not correct. Prepetition conduct of a debtor can be considered to determine whether cause exists under § 1112(b)(4) to covert or dismiss on the ground the Chapter 11 case was filed in bad faith.").

Additionally, where a debtor's goal is simply to "impede, delay, forum shop or obtain a tactical advantage regarding litigation ongoing in [a] nonbankruptcy forum," courts have found bad faith. *See In re Silberkraus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000) (citing cases); *In re Paige*, 685 F.3d 1160, 1178-79 (10th Cir. 2012); *In re 15375 Memorial Corp. v. Bepco L.P.*, 589 F.3d 605, 619 (3d Cir. 2009) (We "focus[ ] on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose" and "(2) whether the petition is filed merely to obtain a tactical litigation advantage.").

Here, the Bankruptcy Court specifically found that Roberts sought protection under Chapter 11 in order to "re-litigate and invalidate the judgments of the Denver District

28

Court" and "manipulate the judicial system." Under the foregoing tests, this is classic bad faith and warrants conversion to a Chapter 7 proceeding.

### 2. The Findings of Bad Faith Are Supported by the Record

Roberts attempts to encapsulate the PdC Creditors' case as having "merely relied on the orders of the Denver District Court and asked the Bankruptcy Court to infer that the falsely-obtained orders in state court demonstrated bad faith in the Bankruptcy Court." Opening Brief, p. 24. This largely mischaracterizes the grounds stated in the Motion to Convert and the evidence presented at the Conversion Hearing. Rather, as ultimately concluded by the Bankruptcy Court, it was Roberts' attempt to exploit the Bankruptcy Code as a means to "re-litigate and invalidate the judgments of the Denver District Court" and "manipulate the judicial system" that are emblematic of his bad faith. Putting aside Roberts' misconduct before the Denver District Court, the Bankruptcy Court's finding of an invalid bankruptcy purpose is well supported by the record.

First, Roberts filed for bankruptcy relief on the eve of the state court Damages Hearing, for which he had already lost on the merits and was facing a multi-million dollar judgment. The PdC Creditors' damages were ultimately liquidated in excess of $21 million. Roberts' counsel conceded that "the case was filed because we anticipated Judge Moses would enter a catastrophic award against Mr. Roberts. . . ." Appl. Apx. 0693; June 30, 2022 Tr. 76:20-22. Roberts' filing for bankruptcy three days before the Damages Hearing, taken with his subsequent attempts to shop the State Court Litigation to a friendlier forum, evinces an intent to "impede, delay, forum shop or obtain a tactical advantage regarding litigation" and thus supports a finding of bad faith.

Second, the Debtor filed for bankruptcy relief to obtain release from jail without having to purge the Denver District Court's civil contempt orders. Appl. Apx. 0474-0486;

Conversion Order, p. 9. Roberts' counsel candidly stated that "I don't think anyone would be honest if they said Mr. Roberts' incarceration wasn't one of the factors [for filing the petition]. . . ." Appl. Apx. 0676; June 29, 2022 Tr. 59:23-24. Moreover, even though Roberts was released from jail following the filing of his Bankruptcy Petition, he admittedly took no action during the ensuing months to purge his contempt.

Third, Roberts filed for bankruptcy relief in an effort to forum shop after faring poorly in almost every aspect of the State Court Litigation. Examples include his response to PdC's Initial Stay Motion, and his filing of three adversary proceedings seeking to have the Bankruptcy Court relitigate matters that were already decided by the Denver District Court. Roberts testified repeatedly that one of the reasons he filed for bankruptcy was to consolidate the State Court Litigation in the Bankruptcy Court ("I was hoping to bring my various legal actions that were going on in different localities and the businesses that were in existence into one domain so that it could be managed effectively."). Appl. Apx. 0723; June 29, 2022 Tr. 106:13-19. Roberts' "various legal actions" were already consolidated in the Denver District Court. This includes the Ciro Lawsuit, that had originally been filed in Arapahoe County.

Finally, Roberts' Plan represents a last-ditch effort to circumvent the rulings of the Denver District Court. For instance, Roberts asserts in the Plan that "The Debtor's right, title and interest in and to the subject real property and the liens encumbering it have been thoroughly litigated to resolution in Mexico both at the state and federal court levels." Appl. Apx. 1512, Plan, p. 10. This language directly contradicts the findings of the Denver District Court in the Preliminary Injunction Order, the Contempt Order, the Purge Order and the Damages Order.

120195408.1

### 3.    The Bankruptcy Court Properly Applied the *In Re Laguna Associates* Factors in Finding Bad Faith

Roberts is critical of the Bankruptcy Court's analysis and application of the factors outlined in *In re Laguna Associates*, 30 F.3d 734, 738 (6th Cir. 1994), arguing that the Bankruptcy Court was "unduly influenced by the orders of the Denver Court." Opening Brief at p. 31. First, the relevant orders from the State Court Litigation were admitted into evidence. Appl. Apx. 0651, 0652 and 0656; Tr. June 29, 2022, pp. 34, 35 and 39. Roberts does not assert error as to the admission of those exhibits. The orders speak for themselves. Once admitted into evidence, Roberts is in no position to complain that the Bankruptcy Court was "unduly influenced" by their contents. Second, the Bankruptcy Court's finding that the factors weighed towards a finding of bad faith is supported by the record.

For instance, the second *Laguna* factor asks whether the pre-petition conduct of the debtor has been improper. The Bankruptcy Court found that "Roberts committed fraud and breached his fiduciary duties; lied under oath multiple times; and disobeyed direct orders of the Denver District Court." Appl. Apx. 0474-0486; Conversion Order, p. 8. In response, Roberts argues that "no fraud was ever proved and no finding of liability in fraud was made in the Denver Court." Opening Brief at p. 31. This statement must be juxtaposed with Judge Moses' findings in the Damages Order, made after a two-day hearing attended by Roberts, in the context of her award of punitive damages.

- "Roberts' conduct was both willful and wanton and attended by circumstances of fraud." Appl. Apx. 1711-1712; Damages Order, ¶ 75(f).

- "Roberts also acted fraudulently." *Id.*

The evidence of Roberts' prepetition misconduct is overwhelming. This factor certainly weighed in favor of conversion.

The third *Laguna* factor focuses on whether there are only a few unsecured creditors. The Bankruptcy Court determined that this factor weighed in favor of conversion because, but for Roberts' improper prepetition conduct, the PdC creditors would be Roberts' only significant creditor. The Bankruptcy Court's finding is corroborated by the record. The proofs of claim filed in this matter indicate that out of a total of $24,292,538.88 in unsecured debt, the PdC Creditors hold $21,124,986.37 of debt—debt that already reflects a setoff of the amount Roberts paid for the Hotusa lien. An additional $1,498,469.28 is held by Richard Lang and also relates to the State Court Litigation and Serrano Properties. Appl. Apx. 1781-1810; Ex. JJ. And the remaining approximately $1.5 million in unsecured debt is for legal fees Roberts incurred for litigation with the PdC Creditors and living expenses while Roberts' assets were frozen by the Denver District Court. The overwhelming majority of the creditor claims in this case are thus the claims asserted as a result of the State Court Litigation.

The fourth *Laguna* factor considers whether a debtor's property has been posted for foreclosure and the debtor has been unsuccessful in defending against the foreclosure in state court. The Bankruptcy Court concluded that although not posted for foreclosure, Roberts' property has been attached to satisfy his creditors—the same function as foreclosure—and Roberts has been unsuccessful in defending against the attachment in state court. The Bankruptcy Court's conclusion is well founded. The attachment is similar to a foreclosure in that it imposes court control over a debtor's assets. Roberts was unsuccessful in defending against the attachment as his traverse was denied and the Writ

32

of Attachment sustained. Appl. Apx. 0947-0969; Ex. 24, Order Re: July 23, 2021 Hearing on Traverses of August 20, 2020 Writ of Attachment, October 6, 2021.

The fifth *Laguna* factor addresses whether the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. The Bankruptcy Court noted that Roberts filed for bankruptcy relief on the eve of a state court Damages Hearing for which he had already lost on the merits and was facing a multi-million dollar judgment. The Bankruptcy Court's finding is well supported by the record.

The sixth *Laguna* factor asks whether the filing of the petition effectively allows the debtor to evade court orders. The Bankruptcy Court noted that Roberts filed for bankruptcy while in jail for civil contempt for disobeying Denver District Court orders, and his Bankruptcy Petition secured his prompt release from jail without purging his contempt. And contrary to Roberts' assertion that he would have been freed from incarceration after the Damages Hearing, the Preliminary Injunction and Contempt Orders still remain in effect at the time of the Conversion Hearing.

The seventh *Laguna* factor asks whether the debtor has ongoing business or employees. The Bankruptcy Court found that Roberts is an individual investor who has no ongoing business or employees. When questioned by his attorney about what he does for a living, Roberts stated that he does "Investments. Generally it's been mostly real estate investments. I've also done some venture cap investments." Appl. Apx. 0707; Tr. 90:16-20. Roberts' counsel also stated that Debtor does not have employees.  Appl. Apx. 0707; Tr. at 60:23. Although Roberts argues that real estate investing is a business, the U.S. Supreme Court has held that investing, by itself, does not constitute a trade or

33

business. *Frick v. Commissioner,* T.C. Memo. 1989-86, *aff'd* without published opinion, 916 F.2d 715 (7th Cir. 1990) (citing *Higgins v. Comm'r*, 312 U.S. 212 (1941)).

Finally, the eighth *Laguna* factor asks about the lack of possibility of reorganization. The Bankruptcy Court found that the Roberts' Plan proposes to pay unsecured creditors approximately $2 million over five years, and then to pay the balance via a balloon payment of approximately $22 million, which will be funded by a liquidation of property. The Court questioned whether Roberts' Plan is feasible and proposed by means not forbidden by law (in contravention of orders of the Denver District Court), and therefore whether the plan is confirmable under 11 U.S.C. § 1191 and the applicable subsections of 11 U.S.C. § 1129.

The Bankruptcy Court's finding is sound. On its face, the Plan is unconfirmable. Provisions in the Plan at pages 9-10 directly contradict the findings of the Denver District Court in the Preliminary Injunction Order, the Contempt Order, the Purge Order, and the Damages Order and would be sufficient grounds to deny confirmation. Furthermore, the Plan provides for a $22 million "balloon payment" at its conclusion which itself calls into serious question whether the Plan is feasible under 11 U.S.C. § 1129(a)(11). And finally, based on a finding of Roberts' bad faith under Section 1112(b)(4), there is no reasonable likelihood that Roberts can confirm his Plan under Sections 1191(b) and 1129(a)(2). *See In re Ozcelebi,* 639 B.R. 362, 425 (Bankr. S.D. Tex. 2022) ("[G]iven those findings [of bad faith], there is no reasonable likelihood that Debtor could confirm a plan pursuant to § 1191(b), which incorporates § 1129(a)(2), requiring that "[t]he proponent of the plan complies with the applicable provisions of this title.").

In sum, the Bankruptcy Court's finding of bad faith based on the *Laguna* factors is supported by the record. The only factor that doesn't clearly favor the PdC Creditors is

the first factor, which is inapplicable because Roberts' bankruptcy case was not a single-asset bankruptcy.

### 4.     The Bankruptcy Court Was Not Required to Consider "Unusual Circumstances"

Roberts suggests that the Bankruptcy Court erred in failing to consider "unusual circumstances" under Section 1112(b)(2) of the Bankruptcy Code. This is incorrect. The Bankruptcy Court found "cause" for conversion based on Roberts' bad faith. Appl. Apx. 0474-0486, Conversion Order, p. 11. Thus, consideration of "unusual circumstances" was obviated. "The statute is explicit that the Court may not rely on unusual circumstances to refuse to convert or dismiss if it finds cause under § 1112(b)(4)(A)." *In re Brutsche*, 476 B.R. 298, 306 (Bankr. D.N.M. 2012); *In re Morreale v. 2011-SIP-1 CRE/CADC Venture, LLC*, 533 B.R. 320, 322 (D. Colo. 2015).

Even if "unusual circumstances" could be considered, Roberts' laundry list of arguments were all addressed and disposed of by the Bankruptcy Court. A finding of unusual circumstances is within the bankruptcy court's discretion. 7 Collier on Bankruptcy ¶ 1112.05[2] (16th ed. rev. 2011). However, the word 'unusual' contemplates facts that are not common to chapter 11 cases generally." *Id.* Here, Roberts has essentially repackaged his list of complaints regarding the outcome of the State Court Litigation.

At the Conversion Hearing, Roberts was unable to provide any evidence establishing that unusual circumstances existed which might demonstrate that converting or dismissing Roberts' case is not in the best interest of creditors and the estate. The Bankruptcy Court recognized these issues in its Conversion Order, noting that "The Court questions whether Roberts' plan is feasible and proposed by means not forbidden by law (in contravention of orders of the Denver District Court), and therefore whether the plan

120195408.1

is confirmable under 11 U.S.C. § 1191 and the applicable subsections of 11 U.S.C. § 1129." *Id.* at 9. The Bankruptcy Court concluded that, "this case presents a textbook example of a bad faith bankruptcy filing." Appl. Apx. 0474-0486, Conversion Order, p. 9. Therefore, it is easily determined that there are no unusual circumstances that would establish conversion or dismissal of this case is not in the best interest of creditors and the estate.

## VI.    CONCLUSION

As the record abundantly illustrates, Roberts sought relief under the Bankruptcy Code for all of the wrong reasons. Not surprisingly, the Bankruptcy Court concluded that "[t]his case demands the swift appointment of a neutral third party in the form of a Chapter 7 Trustee." Appl. Apx. 0474-0486; Conversion Order, p. 12. The Bankruptcy Court acted well within its discretion in converting the case on the basis of abundant evidence.

Respectfully submitted this 13th day of February, 2023.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Brent R. Cohen*
Brent R. Cohen, No. 11297
Chad S. Caby, No. 30927
1601 19th Street, Suite 1000
Denver, CO 80202
Phone:  (303) 623-9000
Email:    bcohen@lewisroca.com
              ccaby@lewisroca.com

*Attorneys for PdC, LLC, Timothy Flaherty, Timothy Kneen and Riviera Country Club, S. de R.L. C.V.S.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, true and correct copies of the foregoing **BRIEF OF APPELLEES PDC, LLC, TIMOTHY FLAHERTY, TIMOTHY KNEEN AND RIVIERA COUNTRY CLUB, S. DE. R.L. C.V.S.** were electronically filed and served on all counsel properly registered to receive notice via the Court's CM/ECF system, on the following:

Robert C. Podoll, Esq.
Podoll & Podoll, P.C.
Via:  CM/ECF

*Attorneys for Appellant*

and placed in the U.S. mail, first-class postage prepaid,
and addressed to the following:

Mr. Michael J. Roberts Sr.
245 Linden Drive
Boulder, CO 80304-0472

*s/ Jennifer Eastin*
Of Lewis Roca Rothgerber Christie LLP

120195408.1